# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 17, 2006  Decided March 17, 2006

No. 05-5156

LAMAR JOHNSON,
APPELLANT

v.

PAUL A. QUANDER, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 04cv00448)

---

*Timothy P. O'Toole*, Attorney, Public Defender Service of the District of Columbia, argued the cause for appellant. With him on the briefs was *Todd A. Cox*, Attorney.

*Jane M. Lyons*, Assistant U.S. Attorney, argued the cause for appellees. With her on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *Michael J. Ryan*, Assistant U.S. Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: SENTELLE, BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: Lamar Johnson, a former District of Columbia probationer, appeals from a District Court judgment dismissing his action seeking to enjoin the application of the DNA Analysis Backlog Elimination Act of 2000 ("DNA Act" or "the Act"), 42 U.S.C. §§ 14135-14135e. Johnson argued that the Act violated his constitutional rights under the Fourth Amendment and violated other of his constitutional and statutory rights. Because we conclude that the District Court correctly held that the Act is neither facially unconstitutional nor unconstitutional as applied to Johnson, we affirm.

I

On March 27, 2001, Johnson stole two cars while suffering from "previously untreated emotional and mental health problems." Shortly after his arrest, Johnson was taken to a hospital because he was found sitting in a puddle eating dirt. On December 20, 2001, he was convicted in the Superior Court of the District of Columbia on two counts of unarmed robbery in violation of D.C. Code § 22-2801, for which he received a suspended sentence and two years probation.

While Johnson was on probation, the Appellees—agents from the District of Columbia Court Services and Offender Supervision Agency ("CSOSA")—demanded that Johnson provide a DNA sample for inclusion in the Combined DNA Index System ("CODIS"). The CSOSA agents did not have a warrant and did not have individualized suspicion that Johnson had committed a crime (other than the two counts of unarmed robbery for which he had been convicted and placed on probation). However, the agents claimed that Johnson was obligated under the Act to submit his DNA for inclusion in the CODIS database.

The Act provides that CSOSA officials "shall collect a DNA sample from each individual under the supervision of the Agency who is on supervised release, parole, or probation who is, or has been, convicted of a qualifying District of Columbia offense . . . ." 42 U.S.C. § 14135b(a)(2). Congress left to the District of Columbia the responsibility of determining which offenses should be deemed "qualifying District of Columbia offenses." *Id.* § 14135b(d). In turn, the District designated forty-nine separate crimes as "qualifying . . . offenses" under the DNA Act, including robbery and carjacking. *See* D.C. Code § 22-4151(27), (29).

Despite the fact that Johnson was convicted on two counts of a "qualifying offense," he refused to provide a DNA sample to the CSOSA. A Superior Court judge then ordered Johnson to show cause why his probation should not be revoked because of this refusal to comply with the DNA Act. Prior to the probation-revocation proceeding, Johnson filed a complaint in the United States District Court for the District of Columbia, seeking a temporary restraining order ("TRO") to prevent the Appellees from requiring him to provide a DNA sample. Before the District Court could rule on the TRO, the parties proposed to resolve the need for emergency injunctive relief. The parties filed a joint motion, under which Johnson agreed to provide a blood sample. The Appellees agreed to delay processing that sample until after his claims in this action and any subsequent appeals had been resolved. The District Court granted the parties' joint motion and denied Johnson's motion for a TRO.

Thereafter the Appellees filed a motion to dismiss under FED. R. CIV. P. 12(b)(1) and FED. R. CIV. P. 12(b)(6). The District Court concluded—after "[b]alancing the private and public interests" under the totality of the circumstances—that because probationers have diminished expectations of privacy, Johnson did not state a viable Fourth Amendment claim. The

court also rejected Johnson's claims under the Ex Post Facto Clause, the Fifth Amendment, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936, and the International Convention on the Elimination of all Forms of Racial Discrimination ("CERD"). Accordingly, the court granted the Appellees' motion in full and dismissed the case. This appeal ensued.

## II

Johnson raises two claims under the Fourth Amendment. First, Johnson argues it was unconstitutional for the CSOSA to collect his blood while he was still on probation. Second, Johnson argues it is unconstitutional for the government to retain his DNA profile and "re-search" it in the CODIS database after his probationary term expires (which it now has). We reject both claims.

## A

Johnson's first claim is that collection and storage of his DNA is unconstitutional under the Fourth Amendment, which guarantees that the people shall be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." In Johnson's view, the collection and storage of a probationer's DNA "[s]trik[es] at the heart of the Fourth Amendment's most inviolate zone," and as a result, "these searches must always be predicated on some measure of individualized suspicion." Because the Act requires every prisoner, probationer, and parolee convicted of a "qualifying offense" to submit his DNA sample without any showing of individualized suspicion, Johnson argues the Act is unconstitutional. For the reasons set forth below, we disagree.

There is no question that the compulsory extraction of blood for DNA profiling constitutes a "search" within the meaning of the Fourth Amendment. *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 616 (1989) ("We have long recognized that a compelled intrusion into the body for blood to be analyzed for alcohol content must be deemed a Fourth Amendment search." (internal quotation marks, alteration, and citation omitted)); *see also Winston v. Lee*, 470 U.S. 753, 760 (1985); *Schmerber v. California*, 384 U.S. 757, 767-68 (1966). The question before us, therefore, is whether the search was "reasonable." *See Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) ("The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968))).

Although ordinarily the reasonableness *vel non* of a search depends on governmental compliance with the Fourth's Amendment's Warrant Clause, *see, e.g., United States v. U.S. Dist. Court*, 407 U.S. 297, 315-16 (1972), the Supreme Court has applied the "special needs" exception to the warrant requirement to uphold the warrantless search of a probationer's residence, *see Griffin v. Wisconsin*, 483 U.S. 868, 879-80 (1987). In *Griffin*, a police detective contacted Griffin's probation officer's supervisor with information that Griffin might have weapons in his apartment. The supervisor, another probation officer, and three plainclothes policemen went to Griffin's apartment, searched it, and found a weapon. *Id.* at 871. Griffin was arrested and charged with possession of a firearm by a felon. He eventually moved to suppress the evidence uncovered during the warrantless search of his residence. *Id.* at 872.

After he was convicted, Griffin appealed. Affirming his conviction, the Supreme Court explained:

A State's operation of a probation system, like its operation of a school, government office or prison, or its supervision of a regulated industry, likewise presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements. Probation, like incarceration, is a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty. . . . [I]t is always true of probationers (as we have said it to be true of parolees) that they do not enjoy the absolute liberty to which every citizen is entitled, but only conditional liberty properly dependent on observance of special probation restrictions.

These restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large. These same goals require and justify the exercise of supervision to assure that the restrictions are in fact observed.

*Id.* at 873-75 (internal quotation marks, alterations, and citations omitted). While *Griffin* may not establish that every suspicionless search of a parolee is a constitutionally sound "special need," *Griffin* does permit the search of a probationer based on no more than reasonable suspicion—even where the search at issue is triggered by a desire to obtain law enforcement information and motivated by ordinary law enforcement purposes. *Id.* at 880. Thus, even though *Griffin* does not establish the constitutionality of suspicionless searches of probationers, it does stand for the proposition that probationers are entitled to fewer Fourth Amendment protections than are

ordinary citizens, and it does suggest that the special needs exception can apply to law enforcement searches.[1]

Notwithstanding *Griffin*, Johnson argues that "*all* law enforcement searches [must] be premised on some quantum of individualized suspicion." Appellant's Br. at 20 (emphasis in original). But the Supreme Court has "long held that 'the Fourth Amendment imposes no irreducible requirement of [individualized] suspicion.'" *Bd. of Educ. v. Earls*, 536 U.S. 822, 829 (2002) (alteration in original) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976)). "[I]n certain limited circumstances, the Government's [interests are] sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion." *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 668 (1989); *see also Skinner*, 489 U.S. at 624.

Since *Griffin*, the Supreme Court has on only one occasion considered whether law enforcement officials need individualized suspicion to search a probationer. In *United States v. Knights*, 534 U.S. 112 (2001), the Court considered the constitutionality of a probation order that required the defendant to submit to warrantless, suspicionless searches of his person and residence at any time. *See id.* at 114. Shortly after Knights was placed on probation for an unrelated drug offense, someone committed an arson targeting a Pacific Gas & Electric ("PG&E") electrical transformer. *Id.* at 114-15. Because prior

---

[1] Subsequent to *Griffin* the Court has recognized some limits to the "special needs" exception in the context of law enforcement searches. *See Ferguson v. City of Charleston*, 532 U.S. 67, 79 (2001); *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). Because we conclude the statute passes constitutional muster under the totality of the circumstances, we need not explore the somewhat unclear boundaries of the limits on the "special needs" doctrine.

crimes against PG&E had coincided with Knights' court appearances, law enforcement authorities suspected that Knights might be involved in the arson. The police staked out Knights' apartment and observed a suspected accomplice leave with three cylindrical items—potential pipe bombs—going toward a nearby waterway. The police heard three splashes and watched Knights' compatriot walk back to the residence empty-handed. *Id.* at 115. Shortly thereafter, the police approached the accomplice's vehicle and saw "a Molotov cocktail and explosive materials, a gasoline can, and two brass padlocks that fit the description of those removed from the PG&E transformer vault." *Id.*

Knowing that Knights' probation was conditioned on his obligation to submit to suspicionless searches of his person and residence, the police promptly searched Knights' home without a warrant. They uncovered "a detonation cord, ammunition, liquid chemicals, instruction manuals on chemistry and electrical circuitry, bolt cutters, telephone pole-climbing spurs, drug paraphernalia, and a brass padlock stamped 'PG&E.'" *Id.* After Knights was arrested and charged, he moved to suppress the evidence. *Id.* at 116.

The Court analyzed the constitutionality of the search of Knights' apartment under a "totality-of-the-circumstances" standard rather than the "special needs" doctrine. *Id.* at 117-18. Balancing the invasion of Knights' interest in privacy against the State's interest in searching his home without a warrant supported by probable cause, the Court explained that "Knights' status as a probationer subject to a search condition informs both sides of that balance." *Id.* at 119. On one side of the balance is Knights' interest in privacy:

> Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled. Just as other punishments for criminal convictions

curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens.

The judge who sentenced Knights to probation determined that it was necessary to condition the probation on Knights' acceptance of the search provision. It was reasonable to conclude that the search condition would further the two primary goals of probation—rehabilitation and protecting society from future criminal violations. The probation order clearly expressed the search condition and Knights was unambiguously informed of it. The probation condition thus significantly diminished Knights' reasonable expectation of privacy.

*Id*. at 119-20 (internal quotation marks, citations, and footnotes omitted).

On the other side of the balance is the government's interest in keeping tabs on a probationer:

[T]he very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law. The recidivism rate of probationers is significantly higher than the general crime rate. And probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation, and possible incarceration . . . .

* * *

The State has a dual concern with a probationer. On the one hand is the hope that he will successfully . . . be integrated back into the community. On the other is the

concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community. . . . [The State's] interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen.

*Id.* at 120-21 (internal quotation marks and citation omitted). Given this balance, the Court held, the government needs "no more than reasonable suspicion to conduct a search of [a] probationer's house." *Id.* at 121. Because the government had reasonable suspicion that the probationer had engaged in unlawful activity, the Court did not decide whether the government could have relied exclusively upon the warrantless search condition in the defendant's probation order to conduct a suspicionless search. *Id.* at 120 n.6. Thus, "it remains *entirely* an open question whether suspicionless searches of [probationers and parolees] pass constitutional muster when such searches are conducted for law enforcement purposes." *United States v. Kincade*, 379 F.3d 813, 830 (9th Cir. 2004) (en banc) (emphasis in original), *cert. denied*, 125 S. Ct. 1638 (2005). However, every court of appeals that has considered the issue has concluded that the DNA Act is constitutional. *See id.* at 840; *Nicholas v. Goord*, 430 F.3d 652 (2d Cir. 2005); *United States v. Sczubelek*, 402 F.3d 175 (3d Cir. 2005); *Jones v. Murray*, 962 F.2d 302 (4th Cir. 1992); *Groceman v. U.S. Dep't of Justice*, 354 F.3d 411 (5th Cir. 2004) (per curiam); *Green v. Berge*, 354 F.3d 675 (7th Cir. 2004); *United States v. Kimler*, 335 F.3d 1132 (10th Cir. 2003); *Padgett v. Donald*, 401 F.3d 1273 (11th Cir. 2005).

Today we join this unanimous body of authority,[2] and we conclude that the mandatory collection of Johnson's DNA sample was "reasonable" under the Fourth Amendment's balancing test. On one side of the balance, it is well settled that probationers have lesser privacy interests than do ordinary citizens. *See Griffin*, 483 U.S. at 875; *see also Ferguson v. City of Charleston*, 532 U.S. 67, 79-80 n.15 (2001) (emphasizing that *Griffin* turned on "the fact that probationers have a lesser expectation of privacy than the public at large"); *Knights*, 534 U.S. at 119 ("Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens."); *see also People v. Reyes*, 968 P.2d 445, 450 (Cal. 1998) ("As a convicted felon still subject to the Department of Corrections, a parolee has conditional freedom—granted for the specific purpose of monitoring his transition from inmate to free citizen.").

Moreover, the privacy invasion caused by a blood test is relatively small (even when conducted on a free citizen). *See Skinner*, 489 U.S. at 625; *Schmerber*, 384 U.S. at 771; *Breithaupt v. Abram*, 352 U.S. 432, 435-36 (1957). In *Schmerber*, the Court upheld the warrantless extraction of a blood sample from a motorist suspected of driving while intoxicated, despite his refusal to consent to the intrusion. The Court noted that the intrusion occasioned by a blood test is minimal because such "tests are a commonplace in these days of

---

[2] We note that some of these courts have upheld the DNA Act under the "special needs" exception to the warrant requirement, *see, e.g.*, *Nicholas*, 430 F.3d at 668; *Green*, 354 F.3d at 678-79, while others have upheld the Act under the Fourth Amendment's traditional "totality-of-the-circumstances" standard, *see, e.g.*, *Padgett*, 401 F.3d at 1280; *Groceman*, 354 F.3d at 413-14. We do not preclude the possibility that the Act could satisfy the "special needs" analysis.

periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain." *Schmerber*, 384 U.S. at 771 (footnote omitted). "*Schmerber* thus confirmed society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity." *Skinner*, 489 U.S. at 625 (internal quotation marks and citation omitted).

In *Jones v. Murray*, the Fourth Circuit considered the applicability of the *Skinner* line of precedent to the collection of blood for DNA identification bank purposes. That circuit held that "[w]hile we do not accept even this small level of intrusion for free persons without Fourth Amendment constraint . . . the same protections do not hold true for those lawfully confined to the custody of the state." 962 F.2d at 306. The Fourth Circuit went on to note the indisputable principle that "when a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it." *Id.*

The Fourth Circuit further reasoned that courts must "accept this proposition because the identification of suspects is relevant not only to solving the crime for which the suspect is arrested, but also for maintaining a permanent record to solve other past and future crimes." *Id.* Therefore, it cannot be denied that the universal practice of "'booking' procedures that are followed for every suspect arrested for a felony," including fingerprinting, ensues without respect to the relevance of fingerprint identification to the suspect's particular crime. *Id.* As with fingerprinting, we agree with the Fourth Circuit that "the Fourth Amendment does not require an additional finding of individualized suspicion before blood can be taken from incarcerated felons for the purpose of identifying them." *Id.* at 306-07. While we need not decide whether the Fourth

Amendment permits the suspicionless collection of blood samples from every suspect arrested for a felony, *cf. id.* at 306, it certainly permits the collection of a blood sample from a *convicted* felon, like Johnson, while he is still on probation.

Arguably, Johnson's privacy interests differ somewhat from those at stake in *Skinner*, *Schmerber*, and *Jones*: A probationer may have stronger privacy interests than a prisoner, and an individual may have a stronger privacy interest in his permanent identity than he has in the temporary toxicity of his blood. However, we have never held that an *innocent* individual has a Fourth Amendment right to expunge the government's records of his identity. *See Stevenson v. United States*, 380 F.2d 590 (D.C. Cir.), *cert. denied*, 389 U.S. 962 (1967). In *Stevenson*, we held that an individual has no constitutional right to the expungement of his mugshots and fingerprints, notwithstanding the fact that his conviction was subsequently set aside. *Id.* at 593-94. *A fortiori*, a felon like Johnson—whose privacy interests have been diminished by his probationary status—has no viable objection to the government's retention of his identifying information.

On the other side of the balance, the government is "quite justified" in taking steps to keep tabs on ex-convicts, to deter recidivism, and to solve past and future crimes. *Knights*, 534 U.S. at 121; *see also Reyes*, 968 P.2d at 450 ("The state has a *duty* not only to assess the efficacy of its rehabilitative efforts but to protect the public, and the importance of the latter interest justifies the imposition of a warrantless search condition." (emphasis added)). The need to ensure that the community "is not harmed by the probationer's being at large" permits the government "a degree of impingement upon [a probationer's] privacy that would not be constitutional if applied to the public at large." *Griffin*, 483 U.S. at 875. Balancing Johnson's reduced privacy interests against the government's interests in

monitoring probationers, deterring recidivism, and protecting the public, we hold it was reasonable for the Appellees to collect Johnson's DNA while on probation.

B

Johnson's second argument is that the Fourth Amendment prohibits the government from storing his "genetic fingerprint" in the CODIS database and "re-searching" it after he has left the probationary rolls (as he now has). In Johnson's view, "[o]nce probation ends, the individual's privacy interest is restored to the level of other citizens while the government's penal interest disappears." Appellant's Br. at 34. Given this reshuffling of the parties' interests, Johnson argues, the post-probation balance makes it unreasonable to "re-search" ex-convicts' DNA profiles. For the reasons set forth below, we disagree.

1

After a donor's DNA is collected under the Act, it is analyzed "in accordance with publicly available standards that satisfy or exceed the guidelines for [the FBI's] quality assurance program for DNA analysis." 42 U.S.C. § 14132(b)(1). Using "short tandem repeat" ("STR") technology, the government creates a "genetic fingerprint" for each donor by looking for the presence of genic variants known as alleles at thirteen specific loci on DNA present in the specimen. *See Kincade*, 379 F.3d at 818. A copy of the donor's "genetic fingerprint" is then uploaded to the CODIS database, 42 U.S.C. § 14132(a)(1), which allows government officials to match a "genetic fingerprint" with its donor's identity only for "law enforcement identification purposes," "judicial proceedings," and "criminal defense purposes," *id.* § 14132(b)(3). Unauthorized uses or disclosures of DNA information stored in the database are punishable by fines and imprisonment. *Id.* § 14133(c).

We conclude that accessing the records stored in the CODIS database is not a "search" for Fourth Amendment purposes. As the Supreme Court has held, the process of matching one piece of personal information against government records does not implicate the Fourth Amendment. *See Arizona v. Hicks*, 480 U.S. 321 (1987). In *Hicks*, a police officer found an expensive stereo while searching an apartment under exigent circumstances. Suspecting that the stereo system was stolen, the officer wrote down the serial numbers of some of its components. The officer then conveyed the numbers to headquarters and confirmed a match between the serial numbers and stereo components stolen during an armed robbery. *Id.* at 323-24. The Supreme Court held that copying the serial numbers constituted a "search" (insofar as the officer moved the equipment to see the serial numbers), but matching the copied serial numbers against those of the stolen stereo components did not independently implicate the Fourth Amendment. *Id.* at 324-25.

Johnson attempts to avoid the implications of *Hicks* by arguing that the installation of a video camera inside someone's home constitutes one "search," and a new "search" occurs every time a government official monitors the camera. In Johnson's view, "[t]he harm from the government's ability to indefinitely search and re-search [an ex-probationer's] genetic information [is no different] than placing a video camera in a citizen's home." Appellant's Br. at 30. We reject the analogy.

Monitoring an in-home video camera raises Fourth Amendment concerns where it is tantamount to repetitive, surreptitious surveillance of a citizen's private goings on. *Cf. United States v. Karo*, 468 U.S. 705, 716 (1984) ("Indiscriminate monitoring of property that has been withdrawn from public view would present far too serious a threat to privacy interests in the home to escape entirely some sort of

Fourth Amendment oversight."). And because a video feed is constantly updated, it implicates the Fourth Amendment each time a government official monitors it to spy on otherwise private matters. *Cf. id.* at 713-14. By contrast, a felon's DNA fingerprint is more akin to a *snapshot*: It reveals identifying information based on a blood test conducted at a single point in time. Of course, even snapshots can raise Fourth Amendment concerns. *See Mincey v. Arizona*, 437 U.S. 385, 389-92 (1978). However, if a snapshot is taken in conformance with the Fourth Amendment, the government's storage and use of it does not give rise to an independent Fourth Amendment claim. *See California v. Ciraolo*, 476 U.S. 207, 213-15 (1986); *Dow Chem. Co. v. United States*, 476 U.S. 227, 239 (1986).

Accordingly, we conclude that accessing the DNA snapshots contained in the CODIS database does not independently implicate the Fourth Amendment. We note that the consequences of the contrary conclusion would be staggering: Police departments across the country could face an intolerable burden if every "search" of an ordinary fingerprint database were subject to Fourth Amendment challenges. The same applies to DNA fingerprints.

To be sure, genetic fingerprints differ somewhat from their metacarpal brethren, and future technological advances in DNA testing (coupled with possible expansions of the DNA Act's scope) may empower the government to conduct wide-ranging "DNA dragnets" that raise justifiable citations to George Orwell. *See, e.g.*, *Kincade*, 379 F.3d at 849 (Gould, J., concurring); *id.* at 873-74 (Kozinski, J., dissenting); Appellant's Br. at 36-40. Today, however, the DNA Act applies only to felons, and CODIS operates much like an old-fashioned fingerprint database (albeit more efficiently). As the Supreme Court has noted:

> if such dragnet-type law enforcement practices as [Johnson] envisions should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable. Insofar as [Johnson's] complaint appears to be simply that scientific devices such as [DNA testing and CODIS] enable[] the police to be more effective in detecting crime, it simply has no constitutional foundation. We have never equated police efficiency with unconstitutionality, and we decline to do so now.

*United States v. Knotts*, 460 U.S. 276, 284 (1983) (citation omitted). We therefore reject Johnson's claim that the Fourth Amendment applies to each "search" of the CODIS database.

2

Johnson also challenges the government's retention of his blood sample, which he claims might be retested with new technologies in the future. Nothing in the record suggests such future testing is imminent, nor can we analyze its invasiveness until it appears. It is surely not uncommon that evidence of every sort obtained by a lawful search and retained may be useful or provide additional information in the future. If something about some undefined future technology raises constitutional issues, that is a problem for another day.

We are nonetheless advertent to the Supreme Court's teaching in *Kyllo v. United States*, 533 U.S. 27 (2001). There the Court considered whether the use of thermal imaging technology to examine the interior of a dwelling constitutes a "search." After noting that the Fourth Amendment does not "leave the homeowner at the mercy of advancing technology—including imaging technology that could discern all human activity in the home," *id.* at 35-36, the Court held that "[w]here . . . the Government uses a device that is not in general

public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' . . . ." *Id.* at 40.

This is not such a case. Not only is blood testing in common use, *Schmerber*, 384 U.S. at 771, but a "search" is completed upon the drawing of the blood: Any future test on a stored blood sample will not "discern [any] human activity," nor will it constitute a "physical intrusion." Neither *Kyllo* nor any other decision that we have found suggests that evidence becomes any less subject to search, seizure, or retention simply because it might yield additional information in the future.

III

Johnson next argues that the federal DNA Act and the District of Columbia's implementation statute (D.C. Code § 22-4151, which defines a "qualifying District of Columbia offense[]" under the federal DNA Act) violate the Ex Post Facto Clauses of the United States Constitution, art. I, § 9, cl. 3; § 10, cl. 1. In Johnson's view, the legislative histories of both statutes suggest they were enacted with "punitive intent," and it is unconstitutional to apply the statutes retroactively to Johnson's crime, which was committed on March 27, 2001. For the reasons set forth below, we disagree.

A

At the outset, we note that the application of the federal DNA Act to Johnson cannot possibly violate the Ex Post Facto Clause. The federal statute was enacted on December 19, 2000—more than three months before Johnson committed felonious robbery, and more than one year before Johnson was convicted. Thus, the federal DNA Act does not operate retroactively as to Johnson by its own terms. *See INS v. St. Cyr*,

533 U.S. 289, 316-26 (2001). Accordingly, the ex post facto issue arises (if at all) only with respect to the District's implementation statute, which was signed into law on June 15, 2001 (a little less than three months after Johnson committed his crimes).

Appellees concede that the District's implementation statute makes the DNA Act operate retroactively. Thus, the District's implementation statute may be unconstitutional under the Ex Post Facto Clause if it is "punitive." As the Supreme Court has held:

> If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate [the District's] intention to deem it "civil."

*Smith v. Doe*, 538 U.S. 84, 92 (2003) (internal quotation marks and citations omitted). In *Smith*, the Court held Alaska's sex offender registry law does not violate the Ex Post Facto Clause, notwithstanding the fact that the statute's registration provisions were codified in the state's criminal code, failure to register was itself a crime, some of the law's provisions related to criminal administration, and the state's criminal pleading rules required informing a defendant of the statute's requirements. *See id.* at 95-96. Emphasizing the statute's anti-recidivism and public safety provisions, the Court held the statute was non-punitive in both purpose and effect. We reach the same conclusion here.

B

We first consider whether the "purpose" of D.C. Code § 22-4151 was "punitive." As the Supreme Court has instructed: "Whether [the purpose of] a statutory scheme is civil or criminal

is first of all a question of statutory construction." *Smith*, 538 U.S. at 92 (internal quotation marks and citation omitted). Johnson urges us to look for the implementation statute's "punitive intent" by construing its legislative history "in the light most favorable to Mr. Johnson." Appellant's Br. at 46. We reject Johnson's novel canon of interpretation. As with all questions of statutory interpretation, "[w]e consider the statute's text and its structure to determine the legislative objective." *Smith*, 538 U.S. at 92; *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 125 S. Ct. 2611, 2626 (2005); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002).

Nothing in the text or structure of the District's implementation statute suggests its purpose was "punitive"—the law simply defines the offenses subject to DNA collection under the federal Act. *See* D.C. Code § 22-4151 (requiring forty-nine categories of ex-convicts to donate DNA to CODIS, but adding no substantive requirements—punitive or otherwise—to the federal DNA Act's requirements). Given the definitional nature of the implementation statute, it can be understood only as a policy judgment by the District's elected officials regarding which offenses are serious enough to warrant coverage by the federal DNA Act. As the Supreme Court has held, such policy judgments are "an incident of the State's power to protect the health and safety of its citizens," and they should be construed "as evidencing an intent to exercise that regulatory power, and not a purpose to add to the punishment." *Flemming v. Nestor*, 363 U.S. 603, 616 (1960). Relying on *Flemming*, the Court rejected an Ex Post Facto challenge to an Alaska statute that retroactively forced sex offenders to provide the state with identifying information (including mugshots and fingerprints), which the state stored in a massive database. *Smith*, 538 U.S. at 89-91. The Court emphasized that "even if the objective of the [sex offender registration statute] is consistent with the purposes of the Alaska criminal justice system, the State's pursuit of it in

a regulatory scheme does not make the objective punitive." *Id.* at 94; *cf. United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 364 (1984) (upholding a statute requiring forfeiture of unlicensed firearms against a double jeopardy challenge because "[k]eeping potentially dangerous weapons out of the hands of unlicensed dealers is a goal plainly more remedial than punitive").

Similarly here, the District's implementation statute simply carried out part of the state's power to protect the health and safety of its citizens by keeping track of (and deterring future crimes by) ex-convicts. Despite the fact that the statute is codified in the District's criminal code, it did not create new punishments or increase extant punishments. The statute did create a new obligation for ex-convicts to donate their DNA to the CODIS database; however, a minimally invasive blood test, *Skinner*, 489 U.S. at 625, is no more of a "punishment" than forcing convicted sex offenders to disclose their identities or confiscating unlicensed firearms. Moreover, the Supreme Court has held that the revocation of probation (which was the threatened sanction that prompted Johnson's motion for a TRO) does not constitute a "punishment" for purposes of the Ex Post Facto Clause. *See Johnson v. United States*, 529 U.S. 694, 700-01 (2000). Therefore, the "purpose" of the statute was non-punitive.

C

We next consider whether the "effect" of D.C. Code § 22-4151 is "punitive," notwithstanding its non-punitive "purpose." As the Supreme Court has instructed, our inquiry into the effects of the District's implementation statute should be guided by seven factors, which are "neither exhaustive nor dispositive." *89 Firearms*, 465 U.S. at 365 n.7 (internal

quotation marks and citation omitted). Specifically, we must consider:

> [w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned.

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963) (footnotes omitted). In Johnson's view, a mandatory DNA test constitutes "an affirmative disability or restraint," which is "excessive in relation to [any] alternative purpose" that can be assigned to it. Yet again, we disagree.

A blood test differs mightily from "an affirmative disability or restraint." Like a sex-offender registry, the DNA Act "imposes no physical restraint, and so does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint." *Smith*, 538 U.S. at 100; *see also id.* at 99-101 (requiring sex offenders to disclose their identities does not constitute an affirmative disability or restraint); *Flemming*, 363 U.S. at 617 (eliminating deportees' Social Security benefits does not constitute an affirmative disability or restraint); *Hudson v. United States*, 522 U.S. 93, 104 (1997) (debarring an individual from an entire occupation does not constitute an affirmative disability or restraint). The collection and retention of a felon's fingerprints (genetic or otherwise) is far less of an impingement on his liberty than a permanent employment ban or the mandatory disclosure of a sex offender's identity. *Cf. Breithaupt*, 352 U.S. at 435-38 (holding

an involuntary blood test does not implicate an individual's liberty interests). Accordingly, the DNA Act does not impose an "affirmative disability or restraint."

Finally, Johnson argues that the statutes are "excessive in relation to [any] alternative purpose" that might be assigned to them. However, as the District Court correctly pointed out, the statutory text suggests the DNA Act was enacted, in part, to facilitate DNA-based exonerations. *See* 42 U.S.C. § 14132(b)(3)(C) (allowing the use and disclosure of CODIS records for "criminal defense purposes"). The statutory means for accomplishing this "alternative purpose" need not be narrowly tailored: As the Supreme Court has instructed, "[a] statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Smith*, 538 U.S. at 103. Instead, Johnson must show that the Act's non-punitive, alternative purpose is a "sham or mere pretext." *Id.* (internal quotation marks and citation omitted). Nothing in the record or the parties' briefs suggests anything of the sort. Accordingly, the DNA Act's sanction is not "excessive in relation to [its] alternative purpose."

In sum, the DNA Act and the District's implementation statute are "punitive" in neither purpose nor effect. Accordingly, we hold the dismissal of Johnson's ex post facto claim was proper.

IV

We have considered Johnson's other arguments—which include claims under the Due Process and "equal protection" Clauses of the Fifth Amendment, as well as HIPAA and the CERD—and conclude that they are without merit and do not warrant separate discussion. For the reasons set forth above, the judgment of the District Court is

*Affirmed*.