914 A.2d 267

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. JOHN O'HAGEN, DEFENDANT–APPELLANT.

Argued September 26, 2006—Decided January 24, 2007.

144

*Alyssa A. Aiello,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Janet Flanagan,* Deputy Attorney General, argued the cause for respondent (*Anne Milgram,* Acting Attorney General of New Jersey, attorney; *Ms. Flanagan, Patricia M. Prezioso,* Assistant Attorney General and *Larry R. Etzweiler,* Senior Deputy Attorney General, of counsel and on the brief).

Justice WALLACE, JR., delivered the opinion of the Court.

In this appeal, we must determine the constitutionality of the New Jersey DNA Database and Databank Act of 1994 (Act), *N.J.S.A.* 53:1–20.17–20.28, as amended. We granted certification to determine whether the Act violates rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Paragraphs 1 and 7 of the New Jersey Constitution. The Act requires all persons convicted of a crime to give a deoxyribonucleic acid (DNA) sample. We hold that the Act is constitutional under both Constitutions.

## I.

We briefly recite the procedural background. On March 5, 2002, defendant, John O'Hagen, was indicted for third-degree possession of a controlled dangerous substance. He entered into a plea agreement with the State and pled guilty on October 15, 2002. At sentencing, in addition to the imposition of a three-year period of incarceration, the trial court required defendant to submit a blood sample or other biological sample for DNA testing and storage pursuant to *N.J.S.A.* 53:1–20.20. Defendant objected to the collection and testing of his DNA, and appealed. He urged that the Act was unconstitutional under both the United States Consti-

tution and the New Jersey Constitution as an unreasonable search and seizure without a warrant, as well as a violation of equal protection.

In a published opinion, the Appellate Division upheld the constitutionality of the Act under both the Federal and State Constitutions. *State v. O'Hagen*, 380 *N.J.Super.* 133, 881 *A.*2d 733 (2005). The panel found that the State demonstrated special needs beyond the need for normal law enforcement. *Id.* at 147, 881 *A.*2d 733. The panel recognized that the DNA testing was "not for the purpose of uncovering the commission of a crime, but rather, for the purpose of obtaining identification information that can be used in the event independent evidence demonstrates that a crime has been committed." *Id.* at 145–46, 881 *A.*2d 733. The panel also found the special needs of protecting the public, deterrence, accurately prosecuting crimes, and exonerating the innocent were served by the Act. *Id.* at 146–47, 881 *A.*2d 733. In balancing the State's interest in obtaining DNA against the defendant's privacy interest, the panel found that any intrusion of privacy was minimal and "outweighed by the State's need to deter and detect recidivist offenders and the public's interest in promptly identifying and accurately prosecuting the actual perpetrators of crimes." *Id.* at 149, 881 *A.*2d 733. The panel concluded that the Act was "reasonable under both a special needs analysis and the totality of the circumstances test." *Ibid.* Finally, the panel rejected defendant's contention that the Act violated principles of equal protection. *Id.* at 151, 881 *A.*2d 733.

We granted certification to address the constitutionality of the Act. 185 *N.J.* 391, 886 *A.*2d 661 (2005).

## II.

Defendant argues that the special needs test is the proper test to determine whether the Act violates his constitutional protection against unreasonable searches and seizures. He asserts that the special needs test has not been met because the Act's primary purpose is ordinary law enforcement. Defendant also disputes

that DNA is like a fingerprint, contesting that the primary purpose of DNA evidence is to accurately establish the identity of an individual in custody. Further, he urges that even if the courts find a special need, that need does not outweigh his privacy interests. Finally, defendant argues that the Act violates federal and state equal protection.

In contrast, the State contends that the Act is constitutional under either a totality of the circumstances test or a special needs test. However, the State urges that courts should apply the totality of circumstances test and that valid law enforcement purposes clearly outweigh the minimal intrusion of a cotton swab used to retrieve a DNA sample. Additionally, the State argues that the Act is constitutional even under a special needs analysis because each of the purposes of the Act as delineated in *N.J.S.A.* 53:1–20.21 satisfies a special need beyond normal law enforcement concerns. The State declares that deterring recidivism is a special law enforcement problem equally as important as the independent purpose of crime detection. In response to defendant's equal protection challenge, the State argues that a rational basis exists for requiring DNA tests from all individuals convicted of a crime.

### III.

Before we address the issue of the applicable test, we digress to discuss the key portions of the Act. Although their tests differ, DNA statutes have been adopted in each of the fifty states and by Congress. The New Jersey Act requires that "[e]very person convicted or found not guilty by reason of insanity of a crime shall have a blood sample drawn or other biological sample" submitted for the purpose of DNA testing. *N.J.S.A.* 53:1–20.20g (Supp. 2006). Initially only persons convicted of certain sex offenses were required to provide a blood sample for DNA profiling. *L.* 1994, c. 136. However, in 1997, the Act was expanded to include blood samples from juveniles adjudicated delinquent for acts which, if committed by an adult, would constitute a delineated sex offense, as well as from defendants and juveniles found not guilty

by reason of insanity of one of those same offenses. *L.* 1997, *c.* 341. The Act was amended again in 2000 to expand the list of covered crimes and to provide that biological samples other than blood could be utilized for DNA sampling. *L.* 2000, *c.* 118. In 2003, the Act was further amended, effective September 22, 2003, to require DNA samples of all adult and juvenile offenders convicted of a crime or found not guilty by reason of insanity of any crime. *L.* 2003, *c.* 183.

In adopting the Act, the Legislature declared that "DNA databanks are an important tool in criminal investigations and in deterring and detecting recidivist acts." *N.J.S.A.* 53:1–20.18. The DNA test results are to be used for the following purposes:

  a. For law enforcement identification purposes;

  b. For development of a population database;

  c. To support identification research and protocol development of forensic DNA analysis methods;

  d. To assist in the recovery or identification of human remains from mass disasters or for other humanitarian purposes;

  e. For research, administrative and quality control purposes;

  f. For judicial proceedings, by order of the court, if otherwise admissible pursuant to applicable statutes or rules;

  g. For criminal defense purposes, on behalf of a defendant, who shall have access to relevant samples and analyses performed in connection with the case in which the defendant is charged; and

  h. For such other purposes as may be required under federal law as a condition for obtaining federal funding.

[*N.J.S.A.* 53:1–20.21.]

The Act declares that DNA samples and the test results are to be kept confidential. *N.J.S.A.* 53:1–20.27. Further, the disclosure of "individually identifiable DNA information" in "any manner to any person or agency not entitled to receive it" is a disorderly persons offense. *N.J.S.A.* 53:1–20.26.

In addition to establishing a state DNA database, the Act requires the DNA information to be forwarded to the Federal Bureau of Investigation (FBI) for inclusion in the Combined DNA Index System (CODIS), the FBI's national DNA identification index system cataloguing DNA records submitted by state and

local forensic laboratories from across the country and accessible to law enforcement nationwide. *N.J.S.A.* 53:1–20.19, 20.21. In 1990, the FBI established CODIS to store DNA information obtained from federal, state, and local agencies. Consequently, the Federal DNA Act of 1994, 42 *U.S.C.A.* § 14132, formalized the FBI's authority to maintain a DNA database for law enforcement purposes. U.S. Department of Justice, Federal Bureau of Investigation, The FBI's Combined DNA Index System Program: CODIS (Apr. 2000), available at http:www.fbi.gov/hq/lab/codis/brochure.pdf.

## IV.

### A.

It is not disputed that a blood test or cheek swab for the purposes of obtaining a DNA sample is a "search." *Skinner v. Ry. Labor Executives' Ass'n,* 489 *U.S.* 602, 616–17, 109 *S.Ct.* 1402, 1412–13, 103 *L.Ed.*2d 639, 659–60 (1989) (noting that blood tests, breathalyzer tests, and taking of urine constitute searches). The Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution protect citizens against unreasonable searches and seizures. That protection is not against all searches and seizures, but only those that are unreasonable. *Id.* at 619, 109 *S.Ct.* at 1414, 103 *L.Ed.*2d at 661. Whether a search is reasonable under the Fourth Amendment " 'depends on [sic] all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.' " *Ibid.* (citing *United States v. Montoya de Hernandez,* 473 *U.S.* 531, 537, 105 *S.Ct.* 3304, 3308, 87 *L.Ed.*2d 381, 388 (1985)). In making that determination, the Court balances the "intrusion on the individual's Fourth Amendment interests against [the] promotion of legitimate governmental interests." *Ibid.* Generally, "we strike this balance in favor of the procedures described by the Warrant Clause of the Fourth Amendment." *Ibid.* In short, there is a constitutional preference for a judicial determination whether there is probable cause to issue a warrant.

■ To be sure, there are recognized exceptions to the requirement to obtain a warrant for a search and seizure. *See State v. Moore*, 181 *N.J.* 40, 45, 853 *A.*2d 903 (2004) (listing multiple exceptions to warrant requirement). One of those exceptions arises "when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Skinner, supra*, 489 *U.S.* at 619, 109 *S.Ct.* at 1414, 103 *L.Ed.*2d at 661 (quoting *Griffin v. Wisconsin*, 483 *U.S.* 868, 873, 107 *S.Ct.* 3164, 3168, 97 *L.Ed.*2d 709, 717 (1987)). In other circumstances, the United States Supreme Court has not used the special needs test, but rather applied a balancing test examining the totality of the circumstances to assess on one side "the degree to which [the search] intrudes upon an individual's privacy" and, on the other side, "the degree to which it is needed for the promotion of legitimate governmental interests." *Samson v. California*, —— *U.S.* ——, ——, 126 *S.Ct.* 2193, 2197, 165 *L.Ed.*2d 250, 256 (2006) (internal quotations and citation omitted).

Thus far, each appellate court that has addressed the constitutionality of a state or federal DNA testing statute has found the statute constitutional. Although there is unanimity among those courts in sustaining the constitutionality of DNA statutes, there is a split among them concerning the appropriate test that should be used. That is, some courts have applied a general balancing test or a totality of the circumstances test, while other courts have applied a special needs test. *See United States v. Kincade*, 379 *F.*3d 813, 830–31 (9th Cir.2004) (listing over thirty cases upholding compulsory DNA statutes), *cert. denied*, 544 *U.S.* 924, 125 *S.Ct.* 1638, 161 *L.Ed.*2d 483 (2005). We must determine the appropriate test for evaluating the constitutionality of the Act. We will refer to the two relevant tests as the balancing test and the special needs test.

### B.

The appellate courts that adhere to a balancing test to evaluate the constitutionality of a DNA statute rely in part on the analysis

in *United States v. Knights*, 534 *U.S.* 112, 122 *S.Ct.* 587, 151 *L.Ed.*2d 497 (2001). *See United States v. Sczubelek*, 402 *F.*3d 175, 183–84 (3d Cir.2005) (applying balancing test in upholding federal DNA statute), *cert. denied,* —— *U.S.* ——, 126 *S.Ct.* 2930, 165 *L.Ed.*2d 977 (2006); *Padgett v. Donald,* 401 *F.*3d 1273, 1280 (11th Cir.) (applying balancing test in upholding Georgia's DNA statute), *cert. denied sub nom. Boulineau v. Donald,* —— *U.S.* ——, 126 *S.Ct.* 352, 163 *L.Ed.*2d 61 (2005); *Kincade, supra,* 379 *F.*3d at 839 (applying balancing test in rejecting convict's constitutional challenge to federal DNA statute); *Groceman ·v. United States· Dep't of Justice,* 354 *F.*3d 411, 413–14 (5th Cir.2004) (upholding federal DNA statute); *see also Boling v. Romer,* 101 *F.*3d 1336, 1340 (10th Cir.1996) (upholding Colorado's DNA statute); *Rise v. Oregon,* 59 *F.*3d 1556, 1562 (9th Cir.1995) (upholding constitutionality of Oregon's DNA statute based on totality of circumstances), *cert. denied,* 517 *U.S.* 1160, 116 *S.Ct.* 1554, 134 *L.Ed.*2d 656 (1996); *Jones v. Murray,* 962 *F.*2d 302, 307 (4th Cir.) (upholding Virginia's DNA database statute), *cert. denied,* 506 *U.S.* 977, 113 *S.Ct.* 472, 121 *L.Ed.*2d 378 (1992).

In *Knights, supra,* the defendant was a probationer who challenged the constitutionality of the search of his home without a warrant. 534 *U.S.* at 114, 122 *S.Ct.* at 589, 151 *L.Ed.*2d at 502. As a condition of probation, he signed a document that provided for police access to his "person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." *Ibid.* (internal quotations omitted). The defendant argued that the search was unconstitutional because the police did not have a special need beyond normal law enforcement to support the warrantless search. *Id.* at 117–18, 122 *S.Ct.* at 590–91, 151 *L.Ed.*2d at 503–04. In rejecting that argument, the Court found the defendant's significantly diminished expectation of privacy as a probationer balanced against the government's concern that the defendant "will be more likely to engage in criminal conduct than an ordinary member of the community" weighed in favor of the govern-

ment needing only a "reasonable suspicion to conduct a search." *Id.* at 119–21, 122 *S.Ct.* at 591–92, 151 *L.Ed.*2d at 505–06. The Court held that the warrantless search of a probationer, "supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment." *Id.* at 122, 122 *S.Ct.* at 593, 151 *L.Ed.*2d at 507. However, the Court explicitly stated in a footnote that it was not addressing "whether the probation condition so diminished, or completely eliminated, Knights' reasonable expectation of privacy" that a suspicionless search would "satisf[y] the reasonableness requirement of the Fourth Amendment." *Id.* at 120 n. 6, 122 *S.Ct.* at 592, 151 *L.Ed.*2d at 505; *see Mich. Dep't of State Police v. Sitz,* 496 *U.S.* 444, 450, 110 *S.Ct.* 2481, 2485, 110 *L.Ed.*2d 412, 420 (1990) (upholding state highway sobriety checkpoint program because State's interest in preventing drunk driving outweighs the degree of intrusion upon individual motorists who are briefly stopped).

Recently, the United States Supreme Court addressed the question left open in *Knights,* i.e. "whether a condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment." *Samson, supra,* — *U.S.* at —, 126 *S.Ct.* at 2196, 165 *L.Ed.*2d at 256. In *Samson,* the Court validated the decision of a California appellate court upholding the suspicionless search of a parolee's person by a California law enforcement officer pursuant to a California statute requiring all parolees to agree in writing to warrantless, suspicionless searches for the duration of their parole. *Id.* at —, 126 *S.Ct.* at 2202, 165 *L.Ed.*2d at 262. The Court declared that the reasonableness of a search under the Fourth Amendment is determined by an examination of the totality of circumstances. *Id.* at —, 126 *S.Ct.* at 2197, 165 *L.Ed.*2d at 256. Specifically, the reasonableness of a search "is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Ibid.* (internal quotations omitted). The Court found that "parolees like [Sam-

son] have severely diminished expectations of privacy by virtue of their status alone." *Id.* at ——, 126 *S.Ct.* at 2199, 165 *L.Ed.*2d at 259. In considering the interests of the State, the Court found that "a State has an 'overwhelming interest' in supervising parolees," as well as an interest in reducing recidivism. *Id.* at ——, 126 *S.Ct.* at 2200, 165 *L.Ed.*2d at 260. Balancing those interests, "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Id.* at ——, 126 *S.Ct.* at 2202, 165 *L.Ed.*2d at 262. In a footnote, the Court observed that a special needs analysis was not necessary because of its "holding under general Fourth Amendment principles." *Id.* at —— n. 3, 126 *S.Ct.* at 2199, 165 *L.Ed.*2d at 259.

## C.

The appellate courts that apply the special needs test find support in the line of cases beginning with Justice Blackmun's concurrence in *New Jersey v. T.L.O.*, 469 *U.S.* 325, 351, 105 *S.Ct.* 733, 747–48, 83 *L.Ed.*2d 720, 740–41 (1985) (Blackmun, J., concurring). In *T.L.O.*, Justice Blackmun approved the school authority's search of a student locker that was based on individualized suspicion, explaining that probable cause and a warrant were not required where "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Id.* at 351, 105 *S.Ct.* at 748, 83 *L.Ed.*2d at 741 (Blackmun, J., concurring).

Subsequent to *T.L.O.*, the special needs exception to the warrant requirement began to evolve. *See, e.g., Illinois v. Lidster*, 540 *U.S.* 419, 427–28, 124 *S.Ct.* 885, 891, 157 *L.Ed.*2d 843, 852–53 (2004) (upholding brief stop of motorists at checkpoint where police sought information about recent hit-and-run accident); *Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 *U.S.* 822, 829–30, 122 *S.Ct.* 2559, 2564–65, 153 *L.Ed.*2d 735, 744 (2002) (applying special needs principles of *Vernonia Sch. Dist. 47J v. Acton* to validate school's drug testing of all students participating in extracurricular activities); *Ferguson v. City of Charleston*, 532

*U.S.* 67, 84, 121 *S.Ct.* 1281, 1292, 149 *L.Ed.*2d 205, 220 (2001) (finding primary purpose of Charleston's drug testing program for pregnant women was to use threat of "prosecution in order to force women into treatment" and that "extensive involvement of law enforcement" did "not fit within the closely guarded category of 'special needs' "); *City of Indianapolis v. Edmond,* 531 *U.S.* 32, 44, 121 *S.Ct.* 447, 455, 148 *L.Ed.*2d 333, 345 (2000) (finding unconstitutional police checkpoint for general "crime control" purposes because Fourth Amendment forbids such stops in absence of special circumstances); *Chandler v. Miller,* 520 *U.S.* 305, 322, 117 *S.Ct.* 1295, 1305, 137 *L.Ed.*2d 513, 528 (1997) (invalidating Georgia's candidate drug-testing program for lack of special need to overcome Fourth Amendment challenge); *Vernonia Sch. Dist. 47J v. Acton,* 515 *U.S.* 646, 653, 115 *S.Ct.* 2386, 2391, 132 *L.Ed.*2d 564, 574 (1995) (applying special needs analysis to sustain drug-testing programs for student athletes); *Nat'l Treasury Employees Union v. Von Raab,* 489 *U.S.* 656, 665–66, 109 *S.Ct.* 1384, 1391, 103 *L.Ed.*2d 685, 702 (1989) (approving government program that required drug test before promotion to positions involving drug interaction because special government needs outweigh individual privacy expectations); *Skinner, supra,* 489 *U.S.* at 619, 109 *S.Ct.* at 1414, 103 *L.Ed.*2d at 661 (explaining that where special needs beyond normal need for law enforcement exist, Court will "balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context"); *Griffin, supra,* 483 *U.S.* at 879–80, 107 *S.Ct.* at 3171–72, 97 *L.Ed.*2d at 721–22 (holding that special need for supervision justified search of probationer's residence based on information provided by police); *New York v. Burger,* 482 *U.S.* 691, 702, 107 *S.Ct.* 2636, 2643–44, 96 *L.Ed.*2d 601, 613 (1987) (finding special need for exception to warrant requirement "where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened"); *O'Connor v. Ortega,* 480 *U.S.* 709, 725, 107 *S.Ct.* 1492, 1502, 94 *L.Ed.*2d 714, 728 (1987) (concluding that " 'special needs, beyond the normal need for law enforcement make the ...

probable-cause requirement impracticable'" for work related investigations) (citation omitted).

Our own jurisprudence has applied the special needs exception to the probable cause requirement of Article I, Paragraph 7 of our State Constitution. In *In re J.G.*, 151 *N.J.* 565, 701 *A.2d* 1260 (1997), we addressed the constitutionality of *N.J.S.A.* 2C:43–2.2 and *N.J.S.A.* 2A:4A–43.1, "which require sex offenders, upon a request by the victim, 'to submit to ... approved serological test[s] for acquired immune deficiency syndrome (AIDS) or infection with the human immunodeficiency virus (HIV) or any other related virus identified as a probable causative agent of AIDS.'" *Id.* at 569–70, 701 *A.2d* 1260 (citing *N.J.S.A.* 2C:43–2.2a) (footnote omitted). We reviewed the United States Supreme Court's cases applying the special needs test and concluded that just as federal precedent required that we apply a special needs analysis under the Fourth Amendment, "the requirements of Article I, Paragraph 7 of the New Jersey Constitution are met by this approach." *Id.* at 577–78, 701 *A.2d* 1260.

We found the special needs test was met for several reasons. First, we were satisfied that the requirements of the statute were not "intended to facilitate the criminal prosecution of those offenders." *Id.* at 578, 701 *A.2d* 1260. Second, the statute required the State to keep the HIV test results confidential and did not authorize disclosure to the prosecution. *Id.* at 578–79, 701 *A.2d* 1260. Third, we noted that "both the warrant and individualized suspicion requirements are impractical in this context." *Id.* at 579, 701 *A.2d* 1260. We then considered the privacy interests of those offenders and found that "disclosure of [their] HIV status ... threaten privacy interests beyond the taking of the blood sample." *Id.* at 580, 701 *A.2d* 1260. In weighing the competing interests, we balanced "the potential psychological and medical benefits to the victim from disclosure of the assailant's HIV status against the assailant's interest in non-disclosure [and concluded that] the assailant's privacy interests [were] outweighed by the

benefits to a victim who request[ed] serological testing." *Id.* at 588, 701 *A.*2d 1260.

In a companion case, we applied the special needs test to justify the random drug testing of New Jersey Transit police officers. *N.J. Transit PBA Local 304 v. N.J. Transit Corp.,* 151 *N.J.* 531, 701 *A.*2d 1243 (1997). The defendant adopted a drug and alcohol testing program that permitted the random testing of Transit police officers without individualized suspicion. *Id.* at 537–38, 701 *A.*2d 1243. The test's procedure required the collection of urine samples and provided for confidentiality and privacy. *Id.* at 539– 40, 701 *A.*2d 1243. We applied the special needs test because it "enables a court to take into account the complex factors relevant in each case and to balance those factors in such manner as to ensure that the right against unreasonable searches and seizures is adequately protected." *Id.* at 556, 701 *A.*2d 1243. We found that the purpose of the defendant's random drug testing program was to promote "public safety and not to serve law enforcement needs," and that its "substantial interest in protecting its employees and the public" satisfied the first part of the special needs test. *Id.* at 559, 701 *A.*2d 1243.

We next considered the competing privacy interest of the employees. *Ibid.* We found that although the urine sample was an invasion of privacy both during collection and testing, the "testing procedures [were] designed to address these privacy concerns and to minimize the intrusion on the employee's privacy." *Id.* at 559– 60, 701 *A.*2d 1243. In considering the intrusion on the employees' privacy interests, we found a diminished expectation of privacy because of their law enforcement status. *Id.* at 561, 701 *A.*2d 1243. We then balanced "the compelling state interest in promoting safe conduct by armed officers" against the employees' "decreased expectation of privacy," including the "adequate limitations on the obtrusiveness of the testing," to conclude that the special needs test was satisfied, and therefore the random drug testing program was constitutional under Article I, Paragraph 7 of the New Jersey Constitution. *Id.* at 564–65, 701 *A.*2d 1243.

Recently, we re-affirmed the use of the special needs analysis in validating a school district's random drug and alcohol testing program. *Joye v. Hunterdon Cent. Reg'l High Sch. Bd. of Educ.*, 176 *N.J.* 568, 826 *A*.2d 624 (2003). There, the school board required all students participating in any extra-curricular activity or who possessed school parking permits to submit to random drug and alcohol testing. *Id.* at 573, 826 *A*.2d 624. The policy imposed non-criminal penalties on students who tested positive, and the test results were confidential and not provided to the police. *Id.* at 580–81, 826 *A*.2d 624. Applying the special needs test, we recognized that the school district was faced with a substantial drug and alcohol problem and that the school board reasonably tailored its program to meet the scope of the problem. *Id.* at 603, 826 *A*.2d 624. We found that students have a diminished expectation of privacy "born of the government's duty to maintain safety, order, and discipline in the schools." *Id.* at 597, 826 *A*.2d 624. Further, we noted the school's conversion to the less-invasive oral-swab test in concluding that the "school's test policy limits the intrusion on the students' privacy interests and protects their personal dignity to the extent possible under the circumstances." *Id.* at 600–01, 826 *A*.2d 624. In weighing the competing interests, we determined that the substantial interest in maintaining a school environment free of drugs and alcohol out-weighed the students' diminished expectations of privacy, and concluded that the school's standard drug and alcohol testing program was valid under our Constitution. *Id.* at 607, 826 *A*.2d 624. We cautioned that our decision was not intended to open "broad vistas for suspicionless searches," *id.* at 618, 826 *A*.2d 624 (quoting *Chandler, supra,* 520 *U.S.* at 321, 117 *S.Ct.* at 1304, 137 *L.Ed*.2d at 527), and that any "future program will be assessed on the precise record on which it is based within the framework of the special-needs test," *ibid.*

### D.

In the instances that we have considered suspicionless searches under a statute or a state program, we have applied a special

needs test. Although the most recent United States Supreme Court decision in *Samson* strongly suggests that the balancing test, which is an easier test for the State to satisfy, should apply to a Fourth Amendment analysis, we continue to adhere to our statement in *Joye* that future drug and alcohol testing programs will be assessed "within the framework of the special-needs test." The more stringent special needs analysis provides an appropriate framework for evaluating defendant's New Jersey state constitutional claims.

█ Under that test we must first consider whether there is a special governmental need beyond the normal need for law enforcement that justifies testing without individualized suspicion. If there is a special need, we must next examine the privacy interests advanced by defendant and any limitations imposed. Finally, we must weigh the competing governmental need against the privacy interests involved to determine whether DNA testing of convicted persons " 'ranks among the limited circumstances in which suspicionless searches are warranted.' " *J.G., supra,* 151 *N.J.* at 578, 701 *A.*2d 1260 (quoting *Chandler, supra,* 520 *U.S.* at 308, 117 *S.Ct.* at 1298, 137 *L.Ed.*2d at 519).

### E.

█ Defendant agrees that the special needs test applies, but contends that the suspicionless DNA collection statute does not meet the test because the purpose of the statute is ordinary law enforcement. The State counters that the special needs test does not prohibit reliance on law enforcement interests in all circumstances, and urges that there are special needs beyond the normal need for law enforcement to validate the Act.

We start with the purposes enumerated by the Legislature in the DNA Act. Those purposes are identification; development of a population database; support of identification research and protocol development of forensic DNA analysis methods; identification of human remains from mass disasters or for other humanitarian purposes; research, administrative, and quality control purposes;

judicial proceedings; criminal defense purposes; and such other purposes as may be required under federal law as a condition for federal funding. *N.J.S.A.* 53:1–20.21. The Legislature recognized that DNA databanks also will assist in deterring and detecting recidivist's acts. *N.J.S.A.* 53:1–20.18.

Although the enumerated purposes may involve law enforcement to some degree, the central purposes of the DNA testing are not intended to subject the donor to criminal charges. That is, the DNA test result is not intended to directly aid in the prosecution of the donor. Yet, the information obtained may provide evidence that supports the prosecution of individual defendants. Despite that possibility, and in light of the broad purposes that underlie the Act, we find that there is a special governmental need beyond the immediate needs of law enforcement. Our finding is supported by the reasoning in three recently decided cases by the United States Supreme Court. *See Lidster, supra,* 540 *U.S.* at 427–28, 124 *S.Ct.* at 891, 157 *L.Ed.*2d at 852–53; *Ferguson, supra,* 532 *U.S.* at 84, 121 *S.Ct.* at 1292, 149 *L.Ed.*2d at 220; *Edmond, supra,* 531 *U.S.* at 44, 121 *S.Ct.* at 455, 148 *L.Ed.*2d at 345.

In *Edmond, supra,* the Court found unconstitutional a motorist checkpoint established by the City of Indianapolis. 531 *U.S.* at 44, 121 *S.Ct.* at 455, 148 *L.Ed.*2d at 345. There the police stopped vehicles at a checkpoint looking for drunk drivers or other evidence of crimes committed by the occupants of the vehicles. *Id.* at 34–35, 121 *S.Ct.* at 450, 148·*L.Ed.*2d at 339. Following the stop of a vehicle, the police would look inside and walk around the exterior with a sniffing dog, and if evidence of a crime was found, the police would arrest the occupants. *Id.* at 35, 121 *S.Ct.* at 450–51, 148 *L.Ed.*2d at 339. The Court held that, in the absence of special circumstances, a roadblock that was established primarily "to detect evidence of ordinary criminal wrongdoing" violated the Fourth Amendment. *Id.* at 41–42, 121 *S.Ct.* at 454, 148 *L.Ed.*2d at 343.

Similarly, in *Ferguson, supra,* the City of Charleston established a hospital program that required all pregnant patients to

have their urine tested for cocaine. 532 *U.S.* at 71–73, 121 *S.Ct.* at 1284–86, 149 *L.Ed.*2d at 212–13. The Court held that the program was unconstitutional under the special needs test, because the "immediate objective of the searches was to generate evidence for law enforcement purposes." *Id.* at 83, 121 *S.Ct.* at 1291, 149 *L.Ed.*2d at 219.

Compare *Edmond* and *Ferguson* with *Lidster, supra,* where the police established a roadblock checkpoint in an effort to obtain information about an earlier hit-and-run fatal accident in the area of the checkpoint. 540 *U.S.* at 422, 124 *S.Ct.* at 888, 157 *L.Ed.*2d at 849. After the police stopped Lidster's vehicle at the road-block, they suspected he was driving under the influence of alcohol. *Ibid.* The defendant was arrested and subsequently convicted of driving under the influence. *Ibid.* In upholding the constitutionality of the roadblock and the defendant's convictions, the Court observed that some law enforcement objectives fall outside the "general interest in crime control." *Id.* at 424, 124 *S.Ct.* at 889, 157 *L.Ed.*2d at 850.

Under these cases, suspicionless searches are unconstitutional if the immediate purpose is to gather evidence against the individual for general crime control purposes. On the other hand, if the core objective of the police conduct serves a special need other than immediate crime detection, the search may be constitutional. It is the objective of the search that we must focus on to determine whether there is a special need.

Here, the primary purposes of the DNA tests are to create a DNA database and to assist in the identification of persons at a crime scene "should the investigation of such crimes permit resort to DNA testing of evidence." *Nicholas v. Goord,* 430 *F.*3d 652, 668 (2d Cir.2005), *cert. denied,* —— *U.S.* ——, 127 *S.Ct.* 384, 166 *L.Ed.*2d 270 (2006). That is a long-range special need that does not have the immediate objective of gathering evidence against the offender. Significantly, the other purposes of the Act—the support of identification research and protocol development of forensic DNA analysis methods; the assistance in recovery of human

remains from mass disaster or other humanitarian purposes; research, administrative, and quality control purposes; the deterrence and detection of crime; and criminal defense purposes—do not have the immediate objective of generating evidence for law enforcement purposes. In addition, the Act provides that "[a]ll DNA profiles and samples ... shall be treated as confidential," *N.J.S.A.* 53:1–20.27, and any unauthorized disclosure is a disorderly persons offense, *N.J.S.A.* 53:1–20.26.

It would be impractical in compiling a DNA database to require the State to comply with individualized suspicion before obtaining the DNA sample of a convicted person. *See J.G., supra,* 151 *N.J.* at 579, 701 *A.*2d 1260. For that reason, and because the testing is not for the immediate investigation of a specific crime, we conclude that the State DNA testing program extends beyond ordinary law enforcement and "presents a special need that may 'justif[y] the privacy intrusions at issue absent ... individualized suspicion.'" *N.J. Transit, supra,* 151 *N.J.* at 559, 701 *A.*2d 1243.

### F.

We turn now to consider the "competing private and public interests advanced by the parties." *Ibid.* Despite his recognition that the physical intrusion of the buccal swab is slight, that DNA records must be kept confidential, and that the DNA testing under the statute will presently only generate an identifying "fingerprint," defendant urges that the danger lies in the potential for private medical facts that may be revealed in the future. Defendant claims that because DNA advancements are to be expected and because of the possibility that the government will misuse DNA databanks resulting in a major adverse impact on a person's privacy interests, the Act should be found unconstitutional.

In contrast, the State argues that the buccal swab, which is the primary method of DNA sample collection, is even less intrusive than commonplace blood testing, citing *Schmerber v. California,* 384 *U.S.* 757, 771, 86 *S.Ct.* 1826, 1836, 16 *L.Ed.*2d 908, 920 (1966). The State argues that because the only information obtained from

the DNA test relates to the offender's identity, once a person is convicted, his or her identity is a matter of public interest, and there is no longer a legitimate expectation of privacy based on identity. Further, the State urges that defendant's concerns about future advancements in technology that may reveal information beyond identity are unfounded because those future privacy interests may be protected by the courts.

We harbor no doubt that the taking of a buccal cheek swab is a very minor physical intrusion upon the person. Even if a convicted person is required to give a blood sample, that procedure has been held to impose a minimal intrusion. *Ibid.*; *see Skinner, supra,* 489 *U.S.* at 625, 109 *S.Ct.* at 1417–18, 103 *L.Ed.*2d at 665. Moreover, that intrusion is no more intrusive than the fingerprint procedure and the taking of one's photograph that a person must already undergo as part of the normal arrest process.

We have previously noted that beyond the extraction of the identifying substance, the subsequent " 'analysis of the sample to obtain physiological data is a further invasion of the tested [person's] privacy interests.' " *N.J. Transit, supra,* 151 *N.J.* at 560, 701 *A.*2d 1243 (citation omitted). However, defendant acknowledges that the Act expressly requires that the test results remain confidential. Beyond that, the limitations imposed by federal standards also tend to restrict the intrusions on defendant. Some of those protections include the imposition of quality-control and privacy standards for participating states imposing sanctions if those standards are violated, 42 *U.S.C.A.* §§ 14132(b), (c); limiting the information in the database that can be accessed to only a small group of individuals, 42 *U.S.C.A.* § 14132(b)(3); and prescribing criminal penalties for the improper acquisition or disclosure of DNA analysis, 42 *U.S.C.A.* § 14135e(c). Further, as the State indicates in its brief, the Act does not include information relating to a person's biographical data, such as name, date of birth, address, etc., but contains only an identifier for the laboratory and the name of personnel associated with the analysis.

In short, we find that the intrusions on a person's privacy interest occasioned by the DNA test are akin to the intrusions a convicted person will already undergo in the taking and maintaining of fingerprints and a photograph. The DNA test results are merely a more accurate way of identifying that person. *See Sczubelek, supra,* 402 *F.*3d at 185–86 (governmental justification of DNA identification is like "that traditionally advanced for taking fingerprints and photographs, but with additional force because of the potentially greater precision of DNA sampling and matching methods") (citation omitted).

Defendant's argument that exoneration is not a significant factor to consider in evaluating the constitutionality of DNA testing because individuals can voluntarily submit their DNA in an effort to exonerate themselves has little merit. Even if that were true, the use of the DNA data bank "promptly clears thousand of potential suspects—thereby preventing them from ever being put in that position, and 'advancing the overwhelming public interest in prosecuting crimes accurately.'" *Kincade, supra,* 379 *F.*3d at 839 n. 38 (quoting *Rise, supra,* 59 *F.*3d at 1561). We agree with the State that, in some instances, the DNA test will help to exonerate persons who have been wrongfully convicted, while in other cases it will aid in solving future crimes.

In weighing the slight intrusion on a convicted person's privacy interest against the State's compelling interest in maintaining a database that will permit accurate identification of persons at the scene of a crime, as well as other laudatory purposes, we readily conclude that the State's interest is far greater than the donor's. The limitations imposed on the use of the test results reduce the potential intrusion on the convicted person. We therefore conclude that the Act's requirement for collection and analysis of DNA samples from convicted persons is constitutional under both the Federal and New Jersey Constitutions.

## V.

Defendant contends that the statute denies equal protection of the law because, as applied to a person convicted of possession of

drugs, it is not rationally related to the government's interest under the Act. We reject that contention.

The Fourteenth Amendment to the United States Constitution provides that state governments shall not "deny to any person within [their] jurisdiction the equal protection of the law." *U.S. Const.* amend. XIV, ¶ 1. The level of scrutiny that a court must apply "depends on the class of persons affected, the nature of the right implicated, and the level of interference." *Sojourner A. v. Dep't of Human Servs.*, 177 *N.J.* 318, 330, 828 *A.*2d 306 (2003). If a statute regulates a fundamental right of a suspect classification, then the provision is strictly scrutinized, but "when a statute impairs a lesser interest, the federal courts ask only whether it is 'rationally related to legitimate government interests.'" *Ibid.* (citation omitted). Because a suspect classification or fundamental right is not implicated, the DNA Act is subject to a rational basis test under the Federal Constitution.

"Although, the phrase 'equal protection' does not appear in the New Jersey Constitution, it has long been recognized that Article I, paragraph 1, of the State Constitution, 'like the fourteenth amendment, seeks to protect against injustice and against the unequal treatment of those who should be treated alike.'" *Barone v. Dep't of Human Servs.*, 107 *N.J.* 355, 367, 526 *A.*2d 1055 (1987) (quoting *Greenberg v. Kimmelman,* 99 *N.J.* 552, 568, 494 *A.*2d 294 (1985)) (footnote omitted). Article I, Paragraph 1 provides:

> All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.
>
> [*N.J. Const.* art. I, ¶ 1.]

The balancing process by which we decide the challenge to the constitutionality of a statute on state equal protection grounds involves the weighing of three factors: (1) the nature of the right asserted; (2) the extent to which the statute intrudes upon that right; and (3) the public need for the intrusion. *Sojour-*

*ner A., supra,* 177 *N.J.* at 333, 828 *A.2d* 306. Although the test under the Federal Constitution is not identical to that under our constitution, the "tests weigh the same factors and often produce the same result." *Ibid.*

As noted above, the main purposes the Legislature articulated for the Act was to provide a data bank and to aid in the accurate identification of persons. The Act is rationally related to the legitimate governmental interest of having a data bank of DNA that will help solve future crimes, exonerate others who have wrongfully been convicted, and deter others from committing crimes. Moreover, all similarly situated individuals—those convicted of a crime—are treated equally in that they are required to provide a DNA sample. Because of the impracticality of imposing a warrant requirement and individualized suspicion in this context, the overriding public need for the uses of DNA data, the lessened expectation of privacy of a convicted felon, and the minimal nature of the physical intrusion, we find no violation of defendant's constitutional rights.

We conclude that the Act is a reasonable legislative determination that does not violate the equal protection clause of the Fourteenth Amendment to the Federal Constitution or Article I, Paragraph 1 of the New Jersey Constitution.

## VI.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE, and RIVERA–SOTO—6.

*Opposed*—None.