914 A.2d 260 (2007)
189 N.J. 128
A.A., by his parent and guardian B.A., and Jamaal W. Allah, Plaintiffs-Appellants,
v.
ATTORNEY GENERAL OF NEW JERSEY and The New Jersey Department of Corrections, Defendants-Respondents, and
Mercer County Probation Services, Defendant.
Supreme Court of New Jersey.
Argued September 26, 2006.
Decided January 24, 2007.
*261 Lawrence S. Lustberg, argued the cause for appellants (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, and Edward J. Barocas, Director, American Civil Liberties Union of New Jersey Foundation, attorneys).
Larry R. Etzweiler, Senior Deputy Attorney General, argued the cause for respondents (Anne Milgram, Acting Attorney General of New Jersey, attorney; Patricia M. Prezioso and Patrick DeAlmedia, Assistant Attorneys General, of counsel; Mr. Etzweiler and Janet Flanagan, Deputy Attorney General, on the briefs).
Justice WALLACE, JR., delivered the opinion of the Court.
In the companion case of State v. O'Hagen, 189 N.J. 140, 914 A.2d 267, 2007 WL 178017 (2007), also decided today, we upheld the constitutionality of the New Jersey DNA Database and Databank Act of 1994, N.J.S.A. 53:1-20.17-20.28 (Act), as amended. The Act requires that all persons convicted of a crime or found not guilty by reason of insanity submit a deoxyribonucleic acid (DNA) sample. The Act also applies to juveniles who are adjudicated delinquent for committing an act that if committed by an adult would be a crime. In this case, the Appellate Division found that the Act was constitutional as applied to juveniles over the age of fourteen and that expungement when the juvenile reaches the age of majority is not necessary to preserve the constitutionality of the Act. A.A. v. Att'y Gen., 384 N.J.Super. 67, 106, 109, 894 A.2d 31 (2006). We affirm the judgment of the Appellate Division.

I.
On May 29, 2001, Jamaal W. Allah pled guilty to second-degree possession of a controlled dangerous substance with intent to distribute and third-degree possession of a controlled dangerous substance with intent to distribute. On December 7, 2001, the trial court imposed a concurrent sentence of ten years with a five-year period of parole ineligibility.
On October 22, 2002, A.A., age fourteen, pled guilty to an act, which if committed by an adult, would have constituted aggravated assault. The trial court imposed an eighteen-month probationary term.
Pertinent to this appeal, the September 2003 amendment to the Act required DNA sampling of convicted adults and delinquent juveniles whose crimes or delinquent acts preceded the enactment date if the person was currently then serving a sentence of imprisonment, detention, confinement, probation, parole, or other form of supervision. N.J.S.A. 53:1-20.20(g), (h) (as amended by L. 2003, c. 183, § 3). Allah *262 and A.A. were two of the many persons then serving a sentence who were required to submit to DNA testing.
In January 2004, plaintiffs A.A., through his parent and guardian B.A., and Allah filed a complaint challenging the constitutionally of DNA collecting, testing, and databanking pursuant to the Act. Plaintiffs urged that the Act violated the Fourth and Fourteenth Amendments and the Ex Post Facto Clause of the United States Constitution, as well as Article I, Paragraphs 1 and 7 and the Ex Post Facto Clause of the New Jersey Constitution. Plaintiffs sought a preliminary injunction to bar the State from obtaining a biological sample from them pending the outcome of the litigation.
The State opposed the motion and filed a cross-motion to dismiss plaintiffs' complaint. In support of its motion, the State submitted certifications from Linda Jankowski, Laboratory Director of the New Jersey State Police DNA laboratory, and Joseph S. Buttich, Deputy Chief State Investigator for the New Jersey Department of Law and Public Safety, Division of Criminal Justice's Law Enforcement Services Bureau. The certifications explained the process for the collection and maintenance of DNA samples from New Jersey offenders, and how that process comported with nationwide efforts to track offenders' DNA samples for law enforcement purposes.
Jankowski explained that the FBI controls the national Combined DNA Index System (CODIS).
CODIS is a software program containing a collection of data files that permit comparison of biological evidence recovered at crime scenes to DNA profiles of known offenders. The system has two main data files, referred to as indexes, to accomplish this task. The Forensic Index contains DNA profiles developed from biological evidence recovered at crime scenes, where the donor of the biological material is believed to be the perpetrator of the crime. The Convicted Offender Index consists of DNA profiles developed from known samples taken from qualified convicted offenders. Each individual state is charged with determining what crimes qualify for CODIS inclusion. The Forensic Index and the Convicted Offender Index are searched against each other, and investigative leads are generated. Additionally, the Forensic Index is searched against itself, whereby matches link crime scenes.
Jankowski noted that the New Jersey State Police oversees the CODIS laboratory in New Jersey. It receives and maintains the offender samples, sends them for analysis, verifies the analysis, and inputs the profiles into the CODIS system. In describing the procedures, Jankowski observed that the primary method of collecting DNA samples from convicted offenders is by buccal swab. The offenders are asked to swab themselves by inserting a disk-shaped foam stick applicator between their teeth and cheek and then placing it under their tongue for ten seconds.
Once an offender's DNA sample is collected, it is logged into the Laboratory Information Management System by bar code at the New Jersey State Police laboratory, verified with the State Police Records and Identification Unit, and sent to the CODIS Compliance Unit for further verification, data entry, and tracking. After a DNA profile is generated and verified, it is entered into the State DNA Index System (SDIS), and then electronically uploaded to the National DNA Index System (NDIS). CODIS is comprised of NDIS, SDIS, and, if applicable, any Local DNA Index System (LDIS) for states with county or municipal labs. The *263 CODIS Manager within the New Jersey CODIS Unit has the ability to remove any DNA profile entered into SDIS or NDIS if, for example, an offender's conviction is overturned and the charges dismissed.
According to Buttich, "[b]lood samples are taken only in rare and very specific circumstances." Furthermore, "[i]n the event a DNA sample must be obtained by force, which would only be pursuant to supplemental court order, the offender's finger would be pricked while he/she is restrained, and a blood sample would thereby be obtained." In addition, the Department of Human and Senior Services, which supervises individuals who were found not guilty by reason of insanity, may elect to take a DNA sample by blood rather than a buccal swab.
The trial court applied a totality of the circumstances analysis in concluding that both the Federal and New Jersey Constitutions permit the State to conduct a suspicionless search through the DNA testing program. The court held, however, that absent informed consent, the State may not retain plaintiffs' DNA samples or profiles indefinitely, and that convicted persons have a right of expungement when their periods of supervision terminate. The trial court also prohibited the State from sharing plaintiffs' DNA profiles with any other government database that does not provide a comparable right to expungement, including CODIS.
On appeal, the Appellate Division upheld the constitutionality of the Act, but applied a special needs analysis rather than a totality of the circumstances approach. A.A., supra, 384 N.J.Super. at 88, 894 A.2d 31. Writing for the panel, Judge Grall explained that the "need beyond ordinary law enforcement is [the] establishment of a database that will allow officers throughout the state and country to link prior offenders with forensic evidence and thereby detect recidivism and deter offenders who will know about this tool." Id. at 94, 894 A.2d 31. The panel concluded that the State's "special needs beyond ordinary crime detection . . . substantially outweigh[ed] the obtrusiveness of the various intrusions on the offenders' reasonable expectations of privacy." Id. at 105, 894 A.2d 31. Rejecting the need to engraft an expungement remedy, the panel determined that the "government's interest in maintaining the identifying information for use in solving and deterring crimes" continued to outweigh "an offender's countervailing interest in avoiding detection on the basis of the identifying information" after expiration of the sentence. Id. at 112, 894 A.2d 31. The panel further held that pursuant to the Act, the State Police must "`adopt rules governing the procedures to be used in the submission, identification, analysis and storage of DNA samples,'" and "`rules governing the methods of obtaining information from the State database and CODIS and procedures for verification of the identity and authority of the requestor.'" Id. at 106-07, 894 A.2d 31 (quoting N.J.S.A. 53:1-20.23, 20.24b).
In his concurring opinion, in which Judge Parker joined, Judge Stern concluded that a "`search compelled by the DNA Act . . . is reasonable under both a special needs analysis and the totality of circumstances test,'" id. at 113, 894 A.2d 31 (citation omitted), but expressed misgivings about whether the State could "constitutionally use [the DNA] sample to solve a past crime committed by the defendant who was compelled to provide the sample," id. at 114, 894 A.2d 31 (footnote omitted). However, because that issue was not before the court, Judge Stern declined to expand on his concern. Id. at 116, 894 A.2d 31.
We granted plaintiffs' petition for certification, 186 N.J. 366, 895 A.2d 452 (2006), and now affirm.

*264 II.

A.
This appeal raises an issue similar to the one we addressed in O'Hagen. There we held that the proper test to apply under our constitution was the special needs test. O'Hagen, supra, 189 N.J. at 158, 914 A.2d at 277. In making that decision, we were mindful of the United States Supreme Court's recent opinion in Samson v. California, ___ U.S. ___, ___, 126 S.Ct. 2193, 2197, 165 L.Ed.2d 250, 256 (2006) that applied a totality of the circumstances test to sustain the suspicionless search of a parolee's person. Id. at 157, 914 A.2d at 277. Nevertheless, we concluded that our jurisprudence supported the continued application of the more stringent special needs doctrine for suspicionless DNA testing. Id. at 158-59, 914 A.2d at 277-78.
Applying the special needs test, we found that the DNA search served a governmental need beyond the need for ordinary law enforcement. Id. at 159, 914 A.2d at 278. We reasoned that the principal purpose of the Act was to maintain a DNA databank for identification purposes, much like fingerprints, and not for the immediate purpose of gathering evidence against a donor. Id. at 160, 914 A.2d at 279. We also recognized that in some cases the DNA sample would aid in the solving of crimes, leading to the conviction of some and the exoneration of others. Id. at 163, 914 A.2d at 280. Hence, we determined that because the primary purpose of the Act was not to assist in the immediate detection of a crime charged against the donor of the sample, but to develop a databank for future use, such a purpose was beyond the need for ordinary law enforcement. Id. at 160-61, 914 A.2d at 279.
Next, we considered the donor's reasonable expectations of privacy. Id. at 161, 914 A.2d at 279. We found that the buccal swab testing procedure that applied to all persons convicted of a crime was a minimal intrusion on any privacy interest. Id. at 162, 914 A.2d at 280. We also recognized that other intrusions such as fingerprinting and photographs utilized for identification purposes are currently part of the accepted procedures for the processing of persons charged with a crime. Id. at 162, 914 A.2d at 280. Further, we noted that the Act's confidentiality requirements and the imposition of criminal penalties for violations of the confidential provisions of the Act protected against the concern that the DNA would be used for purposes beyond identification. Id. at 162-63, 914 A.2d at 280. Therefore, we determined that the intrusion on the donor's privacy was minimal. Id. at 162-63, 914 A.2d at 280. Finally, after weighing the State's substantial interest against the minimal intrusion on the donor's privacy interest, we concluded that the Act was constitutional. Id. at 163, 914 A.2d at 280-81.

B.
The present case differs slightly from O'Hagen in that it concerns not only an adult, but a juvenile as well. That difference arises because the emphasis of the Juvenile Code is on rehabilitation, expressly stating that its purpose is "to remove from children committing delinquent acts certain statutory consequences of criminal behavior, and to substitute therefor an adequate program of supervision, care and rehabilitation, and a range of sanctions designed to promote accountability and protect the public." N.J.S.A. 2A:4A-21(b) (Supp.2006).
In other contexts, we have required different treatment for juveniles. In re J.G., 169 N.J. 304, 325, 777 A.2d 891 (2001). In J.G., we evaluated the constitutionality *265 of the Megan's Law lifetime reporting requirement, noting that a reporting requirement "sharply contrasts" with "[t]he Juvenile Code's determination that a disposition intended to discipline or rehabilitate an adjudicated delinquent should terminate after three years or at age eighteen, whichever is later." Ibid.
Although we acknowledge that registration and community notification do not constitute dispositions pursuant to the Juvenile Code, we hold, consistent with the purpose underlying N.J.S.A. 2A:4A-47(a), that with respect to juveniles adjudicated delinquent for sexual offenses committed when they were under age fourteen Megan's Law registration and community notification orders shall terminate at age eighteen if the Law Division, after a hearing held on motion of the adjudicated delinquent, determines on the basis of clear and convincing evidence that the delinquent is not likely to pose a threat to the safety of others. We import that standard, but with a higher burden of proof, from N.J.S.A. 2C:7-2, the provision of Megan's Law that authorizes the termination of registration obligations of persons who have not committed a sex offense within fifteen years of conviction or release from a correctional facility, whichever is later. Eligible delinquents unable to satisfy that high standard of proof will continue to be subject to the registration and notification provisions of Megan's Law. But with respect to those adjudicated delinquents whose proofs meet that standard, and whose youthfulness at the time of the offense rendered uncertain his or her criminal capacity and future dangerousness, we believe our holding is faithful to the rehabilitative goals of the Juvenile Code without undermining the salutary objectives of Megan's Law.
[Id. at 337, 777 A.2d 891.]
We carved out a remedy for juveniles under fourteen because we found the Megan's Law requirements to be a substantial intrusion on a person's privacy rights. Each year the person is required to register and, depending upon his or her Tier classification, there are continuing requirements to notify various categories of persons or organizations.
In contrast to the Megan's Law requirements, DNA testing is a one-time procedure that applies equally to juveniles found delinquent and adults found guilty of a crime. Further, unlike Megan's Law, DNA testing has no requirement that the juvenile perform any act in the future. The DNA test results simply act as an identification device, much like a fingerprint, and are stored in a secure local and national database. Consequently, we find no justification to carve out a special exception for juveniles whether under fourteen or fourteen and above.

III.
Plaintiffs further argue that if we conclude that the Act is constitutional, we must engraft a right to expunge the DNA identifier from the database after a convicted adult or juvenile has served the sentence. We disagree.
Although the DNA testing procedure is a search, and to that extent is not the same as fingerprints or photographs, the practical result is the same. There is a one-time event, whether it is the taking of the fingerprint, the taking of a photograph, or the taking of a buccal swab or blood. Of the various intrusions, the taking of a blood sample is probably the most intrusive. Even so, the United States Supreme Court has already found that the taking of a blood test is a minor invasion of privacy. Schmerber v. California, 384 U.S. 757, 771, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908, 920 (1966).
*266 In Schmerber, the United States Supreme Court upheld the warrantless taking of blood from a motorist suspected of driving under the influence of alcohol where consent was given. Id. at 771, 86 S.Ct. at 1836, 16 L.Ed.2d at 920. The Court found that the intrusion resulting from a blood test is minimal because such "tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain." Ibid. (footnote omitted).
The expectation of privacy in the DNA sample of an adult criminal or a juvenile defendant is so minimal as compared to the government's substantial interest that we find no need to give it any greater protection than what we allow for fingerprinting or photographs. Accord Johnson v. Quander, 370 U.S.App.D.C. 167, 440 F.3d 489, 499 (C.A.D.C.2006) (criticizing post-sentence expungement and noting that law enforcement officials routinely retain fingerprints of ex-offenders). We agree with the observation of the Appellate Division that "the government's interest in maintaining the identifying information . . . and an offender's countervailing interest . . . is not appreciably altered upon expiration of an offender's sentence." A.A., supra, 384 N.J.Super. at 112, 894 A.2d 31 (footnote omitted).

IV.
Lastly, plaintiffs argue that even if the DNA Act is constitutional, the use of DNA information to solve crimes committed before the tests were performed is an unconstitutional search not tailored to the Act's purpose to deter and detect recidivism. The State disagrees and argues that the subsequent analysis of DNA samples does not constitute a search.
In Arizona v. Hicks, 480 U.S. 321, 324-25, 107 S.Ct. 1149, 1152, 94 L.Ed.2d 347, 353 (1987), the United States Supreme Court addressed whether the police, who were lawfully in an apartment due to exigent circumstances, could lawfully move expensive stereo equipment and record the serial numbers. Ibid. In concluding that the police officer's moving of the equipment constituted a search, the Court found that "[m]erely inspecting those parts of the turntable that came into view during the latter search would not have constituted an independent search, because it would have produced no additional invasion of respondent's privacy interest." Id. at 325, 107 S.Ct. at 1152, 94 L.Ed.2d at 354. The Court, however, concluded that the search was unreasonable and suppressed the evidence because the police lacked probable cause to search and seize the equipment in plain view. Id. at 326, 107 S.Ct. at 1153, 94 L.Ed.2d at 354-55.
The import of Hicks to the present case is the principle that once a search and seizure is completed, the subsequent use of the evidence does not constitute an independent search because there is no additional invasion of the owner's privacy interest. Plainly said, if the initial search is lawful, the subsequent use of the evidence seized is not a search that implicates the Fourth Amendment.
Recently, the United States Court of Appeals for the District of Columbia Circuit applied the principles in Hicks to conclude that accessing the DNA database also "did not independently implicate the Fourth Amendment." Johnson, supra, 440 F.3d at 498. The Johnson court found that the DNA test was akin to a photograph, and like a photograph "[i]t reveals identifying information . . . at a single point in time." Id. at 499. So long as the DNA test "is taken in conformance with the Fourth Amendment, the government's *267 storage and use of it does not give rise to an independent Fourth Amendment claim." Ibid.
We agree with the reasoning in Johnson. The taking of a saliva sample or a blood test is a search that is completed upon the taking of the sample. As long as the taking of the DNA test is pursuant to the Act, it is a valid search. However, the subsequent retrieval of that information is not a new intrusion of defendant's privacy interest and "is not a `search' for Fourth Amendment purposes." Id. at 498.
We have reiterated that DNA test results are much like fingerprints and photographs in that the results reveal identifying information that can be stored for further use. There is no constitutional bar to using a photograph or a fingerprint in helping to solve a crime, regardless of when the crime was committed, and we find insufficient reason to treat DNA test results in a different manner. Moreover, it would be unreasonable to say that an object or substance could be lawfully searched and seized, but that it could not be used to solve a crime committed prior to the search and seizure. We conclude that DNA test results lawfully obtained pursuant to the Act may be used to solve crimes committed prior to the taking of the DNA test.

V.
The judgment of the Appellate Division is affirmed.
For affirmance  Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA-SOTO6.
Opposed  None.