# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0228-18T1

IN THE MATTER OF THE
INVESTIGATION OF BURGLARY
AND THEFT.

_____

Argued November 5, 2018 – Decided November 28, 2018

Before Judges Sabatino, Haas and Mitterhoff.

On appeal from Superior Court of New Jersey, Law Division, Ocean County, Docket No. 15-020585.

Shiraz I. Deen, Assistant Prosecutor, argued the cause for appellant State of New Jersey (Bradley D. Billhimer, Ocean County Prosecutor, attorney; Samuel J. Marzarella, Chief Appellate Attorney, of counsel; Shiraz I. Deen, on the briefs).

Brian P. Keenan, Assistant Deputy Public Defender, argued the cause for respondent J.P. (Joseph E. Krakora, Public Defender, attorney; Brian P. Keenan, of counsel and on the brief).

Lila B. Leonard, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir A. Grewal, Attorney General, attorney; Lila B. Leonard, of counsel and on the brief).

PER CURIAM

On leave granted, the State appeals the trial court's August 1, 2018 order denying its motion under Rule 3:5A-4 to authorize the investigative detention of J.P., an individual who is suspected of committing burglary and theft. The State sought the court's permission to detain J.P. for the purposes of obtaining a DNA sample from him through a buccal swab.[1] The State contends it needs the DNA sample from J.P. because the DNA sample or samples for him already on file in the DNA database may not be admissible at an eventual trial due to chain-of-custody concerns.

The trial court concluded in a written opinion that the State had failed to make a sufficient showing to detain J.P. and obtain his sample. Specifically, the trial court found the State did not satisfy Rule 3:5A-4(d), which requires the State to demonstrate "the physical characteristics sought [from the person] cannot otherwise practicably be obtained."

---

[1] "[A] buccal cell collection involves wiping a small piece of filler paper or cotton swab similar to a Q-tip against the cheek of an individual to collect some skin cells. The procedure is quick and painless. The swab touches inside an arrestee's mouth, but it requires no 'surgical intrusio[n] beneath the skin,' and it poses no 'threa[t] to the health or safety' of arrestees." Maryland v. King, 569 U.S. 435, 444 (2013) (quoting Winston v. Lee, 470 U.S. 753, 760 (1985)).

A-0228-18T1

For the reasons that follow, we affirm the trial court's order. However, we do so without prejudice to the State's right to file a new application in the trial court to obtain a sample from J.P., who is presently in the State's custody and who will not be released until 2020, if and when it charges him with these offenses.

I.

The State's factual contentions are derived from an affidavit by Sergeant Chase Messer of the Lakewood Township Police Department. We set forth the contentions most pertinent to our analysis.

On March 20, 2015, at approximately 12:34 a.m., Lakewood Township police officers were dispatched to a building on Madison Avenue after an alarm was activated. When the police officers arrived, they spoke with a woman. She informed the officers that she heard a window smash and observed a man approximately 5'8" tall with a thin build and hooded sweatshirt running through her yard and towards Main Street. The woman informed the officers she had observed the man throw a pair of light blue gloves into a trash can in front of her house.

The officers searched the immediate area, but were unable to locate the suspect. Upon a search of the building, the officers noticed a broken window

3

next to the rear door and some dollar bills located on the ground by the steps. An officer located the light blue gloves inside the trash can.

The Ocean County Sherriff's Department Crime Scene Investigations ("CSI") Unit responded to the scene. The CSI unit processed the gloves for DNA, and submitted a DNA sample to the New Jersey State Police ("NJSP") Office of Forensic Sciences.

Sergeant Messer thereafter received a notification letter from the NJSP Office of Forensic Sciences (known as the Combined DNA Index System "'CODIS' lab") informing him of a possible investigative lead on the DNA sample retrieved from the blue gloves. The letter from the CODIS lab reported an "investigative hit" for J.P., and requested that a buccal swab "reference sample" from J.P. be submitted for comparison.

On June 13, 2018, the State moved for an investigative detention of J.P., seeking to have a buccal swab recovered from him and sent to the CODIS lab for analysis. Sergeant Messer averred in his affidavit that he has "probable cause to believe and does believe that the DNA samples of [J.P.] will constitute evidence or tend to show violations of the penal laws of New Jersey." The sergeant added that a "buccal swab of the accused can be used by the [NJSP] to develop genetic profiles to compare to the evidence previously seized, which

were potentially used by the accused, [and] worn by the accused in the commission of the above referenced offenses." The affidavit requested a court order authorizing the Ocean County Sheriff's Department "Criminalistics Unit" to obtain a fresh buccal swab from J.P.

Relying on the sergeant's affidavit, the State moved under Rule 3:5A-4 and requested J.P.'s investigative detention in order to obtain a DNA sample from him. Represented by counsel, J.P. opposed the State's request, arguing that the State did not satisfy the four-part test set forth in Rule 3:5A-4(a) to (d).

After a hearing, Presiding Criminal Judge Wendel E. Daniels denied the State's motion in a written decision. The judge noted that Rule 3:5A-4 sets forth the requirements for issuing an order for investigative detention. The Rule closely tracks the standards prescribed by the New Jersey Supreme Court in State v. Hall, 93 N.J. 552 (1983).

Rule 3:5A-4 provides:

> An order for investigative detention shall be issued only if the judge concludes from the application that:
>
> (a) a crime has been committed and is under active investigation, and
>
> (b) there is a reasonable and well-grounded basis from which to believe that the person sought may have committed the crime, and

(c) the results of the physical characteristics obtained during the detention will significantly advance the investigation and determine whether or not the individual probably committed the crime, and

(d) <u>the physical characteristics sought cannot otherwise practicably be obtained</u>.

[(Emphasis added).]

Judge Daniels concluded the first prong of the <u>Rule</u> was met, based on the information contained in the sergeant's affidavit and the ongoing active investigation by the Ocean County Prosecutor's Office. The judge also found the second prong of the <u>Rule</u> was met, based on the sergeant's affidavit, the general description of the suspect provided by one of the victims, and the initial "hit" notification from the CODIS lab identifying J.P. as a potential lead. Next, the judge found the third prong of the <u>Rule</u> was satisfied because the gloves located near the scene of the offenses contained DNA that could be compared with a DNA sample from J.P., a process that would help to confirm that the gloves used in the burglary and theft belonged to or had been used by J.P.

However, the judge found that the fourth prong of <u>Rule</u> 3:5A-4 was not satisfied. As part of his analysis of that prong, the judge discussed the implications of a recent New Jersey Supreme Court case, <u>State v. Gathers</u>, 234

N.J. 208 (2018), which concerned the New Jersey DNA Database and Databank Act of 1994, N.J.S.A. 53:1-20.17 to -20.26 ("the DNA Act").

Specifically, Judge Daniels found the State had failed to establish that J.P.'s DNA cannot be obtained through other "practicable" means. The judge reasoned that J.P.'s DNA is already available for the State to conduct comparative testing with the DNA found on the blue gloves, because two DNA samples had been previously collected from J.P. and presumably were in the DNA database. The first sample was collected from J.P. after an unrelated felony conviction in 2015. The second was taken from J.P. by the Department of Corrections ("DOC") in April 2018, after he was incarcerated for violating the terms of his parole.[2]

The State argued it must establish a proper chain of custody for the evidential use of the DNA sample in a potential criminal trial against J.P. The State emphasized that, in accordance with customary practices, the samples taken from J.P. were sent to the State Police lab testing not by hand delivery but via mail. That raises the possibility that defense counsel in a future criminal prosecution might seek to suppress the DNA results due to an unreliable chain

---

[2] As we have already noted in the introductory portion of this opinion, counsel represented to us at oral argument that J.P. is not expected to be released from the State's custody for an unrelated parole violation until the year 2020.

of custody. The State further underscored that State Police policies require law enforcement agencies to obtain a proper and admissible fresh DNA sample in these circumstances. Thus, the State argued, under subsection (d) of the investigative detention Rule, the State's reliance at trial on a previously drawn sample from J.P. was not "practicable."

Judge Daniels found these arguments unpersuasive. He concluded the State had failed to establish the present necessity of obtaining a fresh DNA sample from J.P. Among other things, the judge found the State had not provided sufficient grounds to call into question the chain of custody of the existing sample or samples.

Following the judge's denial of its application, the State moved for leave to appeal, which we granted. We also granted the Attorney General's unopposed motion to allow his office to participate in the appeal as an amicus.

## II.

The pivotal question before us is whether the State has satisfied the fourth prong of Rule 3:5A-4, as expressed in subsection (d), i.e., whether "the physical characteristics sought [from J.P.] cannot otherwise practicably be obtained."[3]

---

[3] We agree with the trial court that the first three prongs of the Rule in subsections (a), (b), and (c) are satisfied.

A-0228-18T1

Although J.P. is already in the State's custody for another offense, the State wishes to "detain" him for the purposes of taking a fresh DNA sample. The State insists it cannot otherwise "practicably" obtain a DNA sample from him that would yield comparative tests admissible in court, because the prior samples taken from him have a possibly unreliable chain of custody. The State's arguments implicate the DNA Act, which we now proceed to discuss.

A.

The DNA Act requires persons convicted of certain offenses to provide samples of blood or biological matter for DNA profiling and for use in connection with subsequent criminal investigations. The Act requires the NJSP to record, store, and maintain the characteristics of DNA samples in the State DNA database. The DNA sample itself is stored and maintained in the State DNA databank. See N.J.S.A. 53:1-20.21.

The enumerated "mandatory" offenses requiring a person to submit a DNA sample are set forth in N.J.S.A. 53:1-20.20(a) to (i). Subsections (a) to (c) require defendants arrested, convicted, found not guilty by reason of insanity, or juveniles adjudicated delinquent of serious sexual offenses to submit a DNA sample. N.J.S.A. 53:1-20.20(a) to (c). Subsections (d) through (f) require defendants arrested, convicted, found not guilty by reason of insanity, or

juveniles adjudicated delinquent of murder, manslaughter, aggravated assault of the second degree, kidnapping, luring or enticing a child, engaging in conduct tending to debauch or impair the morals of a child, or an attempt of any of these crimes, to submit a DNA sample.  N.J.S.A. 53:1-20.20(d) to (f).

Subsections (g) and (h) require defendants convicted, found not guilty by reason of insanity, or juveniles adjudicated delinquent of "of a crime or a specified disorderly person offense" to submit a DNA sample.[4]  N.J.S.A. 53:1-20.20(g) to (h).  The statute contains no mandate that persons arrested for offenses enumerated in subsections (g) and (h) be required to submit a DNA sample.[5]

---

[4]   The Act defines a "specified disorderly persons offense" as: "assault constituting domestic violence as defined . . . in N.J.S.A. 2C:25-19; prostitution pursuant to N.J.S.A. 2C:34-1; any disorderly persons offense relating to narcotics or dangerous drugs for which a person is required to be fingerprinted pursuant to . . . N.J.S.A. 53:1-18.1, excluding possession of 50 grams or less of marijuana, including any adulterants or dilutants, or five grams or less of hashish under N.J.S.A 2C:35-10; or any other disorderly persons offense for which a person is required to be fingerprinted pursuant to N.J.S.A. 53:1-15.  A 'specified disorderly persons offense' shall not include shoplifting pursuant to N.J.S.2C:20-11."  N.J.S.A. 53:1-20.20(h).

[5]   The Legislature amended the Act in 2011 to include samples from persons arrested for certain violent offenses.  See 2011 N.J. Sess. Law Serv. Ch. 104. (SENATE 737); see also  N.J. S. Comm. Statement, S.B. 737 (Mar. 18, 2010) (acknowledging that the amendment would expand "the State's DNA database to include DNA samples from persons arrested for certain violent crimes").

Lastly, and most relevant to this case, subsection (i) provides: "[n]othing in this [A]ct shall be deemed to limit or preclude collection of DNA samples <u>as authorized by court order or in accordance with any other law</u>." N.J.S.A. 53:1-20.20(i) (emphasis added). Although not explicitly stated in the statute, DNA samples submitted pursuant to a court-ordered investigative detention under Rule 3:5A-4 would logically fall into this category.

Here, J.P. has not yet been arrested for the burglary and theft incidents, let alone convicted, and therefore he would not qualify under subsections (a) through (h) for mandatory DNA sampling. Therefore, only subsection (i) applies to this appeal.

The DNA Act further provides that DNA test results "shall be used" for the following purposes:

      a.     For law enforcement identification purposes;

      b.     For development of a population database;

      c.     To support identification research and protocol development of forensic DNA analysis methods;

      d.     To assist in the recovery or identification of human remains from mass disasters or for other humanitarian purposes;

      e.     For research, administrative and quality control purposes;

f.	For judicial proceedings, by order of the court, if otherwise admissible pursuant to applicable statutes or rules;

g.	For criminal defense purposes, on behalf of a defendant, who shall have access to relevant samples and analyses performed in connection with the case in which the defendant is charged; and

h.	For such other purposes as may be required under federal law as a condition for obtaining federal funding.

[N.J.S.A. 53:1–20.21.]

The State's request for sampling in the present case falls under subsections (a) ("law enforcement identification"), (f) ("judicial proceedings, by order of the court"), and also possibly (g) ("for criminal defense purposes") of Section 20.21.

In addition to establishing a state DNA database, the Act requires the DNA characteristics obtained from sampling to be forwarded to the Federal Bureau of Investigation ("FBI") for inclusion in CODIS, which is the FBI's national DNA identification index system cataloguing DNA records submitted by state and local forensic laboratories from across the country. N.J.A.C. 13:81-1.1 to -1.2. The National DNA Index System ("NDIS") allows states to compare DNA information, through CODIS, with one another. To participate in NDIS, laboratories must meet certain accreditation requirements. NDIS Operational Procedures Manual, 12 (Version 7: Effective June 1, 2018) ("NDIS Manual").

NDIS-participating laboratories are subject to annual audits by the FBI's CODIS Unit, which reviews laboratory records to ensure compliance with quality and control requirements. NDIS Manual, at 6-8 (2018).

The NJSP oversees compliance with NDIS and CODIS laboratories in New Jersey and uploads the samples into CODIS. See N.J.S.A. 53:1-20.24. The NJSP receives and maintains the offender samples, sends them for analysis, verifies the analysis, and inputs the profiles into the CODIS system. A.A. ex rel. B.A. v. Attorney Gen. of New Jersey, 189 N.J. 128, 132 (2007). The NJSP, pursuant to authority granted by N.J.S.A. 53:1-20.23, has adopted rules governing the procedures and administration of the DNA Act. See N.J.A.C. 13:81-1.1 to -7.1.

The State and the Attorney General argue the procedures outlined in NDIS Manual require a newly obtained DNA sample for J.P., in order to enable the State to confirm a match with the DNA found on the blue gloves near the crime scene. The relevant section of the NDIS Manual provides:

> Although notification of the confirmed match to the Submitting Law Enforcement Agency concludes the NDIS Offender Match confirmation process, it is not the end of the collaboration.
>
> The NDIS participating laboratory shall inform the Submitting Law Enforcement Agency of the need for a legally obtained sample from the offender that

documents the chain of custody. The Casework Laboratory can then perform DNA analysis on the newly obtained known biological sample submitted by the Law Enforcement Agency.

[NDIS Manual § 6.1.3.5 (emphasis added).]

As we have already noted, the State's objection to relying upon J.P.'s previous buccal swabs is based on its concern that the prosecution would not be able to verify the chain of custody between the samples sent from the DOC to the NJSP. In support of its argument, the State has provided a memorandum from the NJSP's CODIS Compliance Unit, dated June 6, 2013, which provides the following guidance to law enforcement officials and agencies:

> Numerous training opportunities were provided throughout the state over the past year to demonstrate the proper use of the Offender DNA Collection Kits supplied by the CODIS Compliance Unit . . . . Convicted offender and arrestee samples are used for investigative purposes and are not considered evidence. They are submitted through the US mail and have no chain of custody associated with them.
>
> Please do not use the Offender DNA Collection Kits supplied by the CODIS Compliance Unit for any other purpose than CODIS Database submissions from qualifying convicted offenders/arrestees . . . . The Offender DNA Collection Kits, including the Submission Form, sterile swab, and micro card, are not to be used for casework evidentiary items, known subject reference samples such as suspects collected pursuant to a subpoena or consent/ or person of interest samples.

> Reference samples required from persons of interest or known suspects should be submitted if possible with the other evidentiary items in the case. These samples should be collected directly onto your agency's typical sterile cotton swab by swabbing the inside of the cheek using twelve (12) up and down strokes with the cotton swab. The swab should be allowed to dry and then packaged in a cardboard container or simply placed in a sealed envelope. These samples require a strict chain of custody for future court purposes and should be hand-delivered to the laboratory by the law enforcement personnel from the relevant agency. The Offender DNA Collection kits should not be used to obtain these reference samples.

[(Emphasis both in original and added).]

The memorandum directs the law enforcement agencies to submit reference samples from "persons of interest" to the Office, but does not specifically explain how a law enforcement agency should obtain such reference samples.

The Attorney General as amicus takes the position that the policy of requiring the new sample is a "protective measure for the benefit of defendants," and that "[t]he confirmatory samples are an extra layer of protection to ensure that DNA stored in CODIS linked to a particular person is actually that person's DNA."

J.P. counters that the possible unreliability of the chain of custody is the State's self-generated problem. He asserts that the State can avoid the problem

in the future simply by hand-delivering future DNA samples to the NJSP rather than mailing them.

The most recent New Jersey Supreme Court addressing the procedures for obtaining DNA swabs is Gathers, 234 N.J. at 218. The Supreme Court in Gathers affirmed this court's ruling that the State's motion to compel the defendant in that case to submit a buccal swab did not set forth adequate probable cause for such sampling. State v. Gathers, 456 N.J. Super. 256, 272 (App. Div. 2017), aff'd, 234 N.J. 208 (2018).

In Gathers, 234 N.J. at 214, two police officers responded to a "call of shots fired." After canvassing the area, the officers found a gun on the ground but did not locate the shooter. Ibid. The same night, the officers were informed that a male had been shot near the area where the shots were allegedly fired and officers responded to a nearby hospital where they encountered the defendant who had sustained a bullet wound on his left leg. Ibid. Three months later, a grand jury indicted defendant for weapon possession offenses. Five months after the defendant's indictment, the State moved for an order compelling the defendant to submit to a buccal swab. Id. at 215. The State argued that, due to chain-of-custody problems, many DNA collection kit profiles are not considered admissible evidence. Therefore, according to the State, even after a CODIS

A-0228-18T1

"hit," the State usually applies for a confirmatory buccal swab to establish the chain of custody. Id. at 218.

In support of the its motion, the State in Gathers submitted an assistant prosecutor's certification, explaining that a sample of the defendant's DNA was needed for reference in order to make proper comparisons to the items of evidence already submitted to the State Police. Id. at 215. The defense countered that the State could use the defendant's DNA profile that was already in CODIS from a separate drug offense years prior. Id. at 216. Indeed, this court's opinion noted that the DNA Act "prohibits the collection of blood or biological sample[s] if the State 'has previously received a blood or biological sample from the convicted person.'" Gathers, 156 N.J. Super. at 272 (quoting N.J.S.A. 53:1-20.22(b)). The Supreme Court in Gathers did not discuss this argument in depth because DNA samples related to possessory offenses are not eligible for upload into CODIS and the defendant's charges were all possessory crimes. Gathers, 234 N.J. at 224.

The Court in Gathers observed that "our State Legislature has not provided authority to take a defendant's buccal swab at any time prior to conviction except in specific circumstances. Furthermore, the statute allows for the taking of a buccal swab only at the time of booking or indictment for certain enumerated

offenses." Id. at 221 (emphasis added) (citation omitted). The Court continued, "[f]or that reason, we must consider the nature and quality of the evidence upon which the order was obtained" explaining that such a determination is based on whether the evidence provided to the court would be sufficient to establish probable cause. Ibid.

We are mindful there may be constitutional limitations for the taking of a person's DNA upon arrest, depending upon the severity of the charged offenses. See King, 569 U.S. at 456-66 (upholding DNA sampling taken upon arrest from a defendant charged with "serious offenses" of first-degree and second-degree assault, as part of a "reasonable search that can be considered part of a routine booking procedure," noting that the privacy expectations of such a person taken into police custody are "of a diminished scope").

## B.

With this context of the DNA Act and pertinent case law in mind, we return to the trial court's application of the investigative detention provisions in Rule 3:5A-4. It is clear that there is no "mandatory" basis to extract a fresh DNA sample from J.P. under N.J.S.A. 53:1-20.20(a) through (h). The question then becomes whether the State has a valid non-mandatory basis to obtain the DNA sample from J.P. with a court order under authority of the Rule.

Having considered the arguments of the State, the Attorney General, and J.P. in this factual and procedural context, we conclude the trial court did not err in denying the State's motion, given the present status of the burglary and theft matter. The State has yet to demonstrate it will not be "practicable" to make evidential use of the original sample taken from him previously in 2015 or the 2018 sample.[6] The trial court reasonably concluded the State's application is, in essence, premature.

We conclude the State's request can be renewed through an appropriate motion after it charges J.P. with the burglary and theft offenses, assuming it chooses to do so. Although the existing sample in CODIS may or may not be admissible at a future trial, the apparent "match" with DNA from the blue gloves, coupled with the witness's observations, appear to support probable cause to charge J.P. As we noted, the judge's finding of probable cause within the context of this motion record is sound.

---

[6] At oral argument on appeal, counsel for J.P. argued the second sample taken in 2018 at the time of his arrest for parole violations could not be used because that sample, taken without a court order, violates N.J.S.A. 53:1-20.22, which J.P. construes to disallow such repetitive sampling where a DNA sample for a person is already on file with CODIS. It is not clear, however, that the prohibition in Section 20.22 applies to a situation where, as here, the State applies for a court order requesting an additional sample.

If J.P. is actually charged, the legal context materially changes. Rule 3:5A-4 reflects a careful balancing of interests between the State's investigatory needs and a citizen's interests in liberty and prison. See Hall, 93 N.J. at 557; see also State v. Rolle, 265 N.J. Super. 482, 486 (App. Div. 1993). The individual's interests essentially have two components: (1) the freedom to move about society and not be detained by government; and (2) freedom from a search of his or her person.

In the present case, J.P. is already confined in the State's custody. He will not be released until 2020. As such, he has a diminished expectation of liberty, as he is, for all practical purposes, already "detained." The question then would become whether the State's law enforcement interests, post-charge, outweigh J.P.'s right to be free from unreasonable searches and seizures. See State v. O'Hagen, 189 N.J. 140, 149 (2007) ("It is not disputed that a blood test or cheek swab for purposes of obtaining a DNA sample is a 'search.'"). Although we need not decide that balance here definitively, we suggest a post-charge context may result in a different outcome if the State files a new application to compel a swab after lodging such charges.

This distinction between post-charge and post-arrest situations from pre-charge and pre-arrest situations is consistent with the background of Rule 3:5A-

4 and the 1984 Report of the Supreme Court's Committee on Criminal Practice, 113 N.J.L.J. 698-99 (June 21, 1984). The Committee observed in its Report:

> The rule, as drafted, is a response to [the Supreme Court's] referral [in State v. Hall]. It is specifically limited to pre-charge applications. Once a person who has been charged and the court has obtained jurisdiction there is no legal impediment imposed by the Fourth or Fifth Amendments to an order compelling him to disclose identifying physical characteristics.
>
> [Report of the Supreme Court's Committee on Criminal Practice, 113 N.J.L.J. at 698 (citations omitted).]

The Committee's comments and rationale are instructive. If the State charges J.P. with burglary and theft, and he remains, as expected, in the State's custody, we discern no "impediment" to the State making an application to the trial court to obtain a fresh DNA sample from him, with the defense at that time presenting any countervailing arguments it may have. Although such a future application may not literally fit the intended "pre-charge" terms of Rule 3:5A-4, the balancing-of-factors test logically should apply. Indeed, this court in Gathers presumed that the State could have attempted to extract a swab from the defendant at the time of his arrest, but failed to do so. Gathers, 449 N.J. Super. at 271 (noting that the State's request for a swab was pursued long after "the arrest stage"). We suggest the State could make such an application at the time of J.P.'s initial appearance, if he is indeed charged.

21

We discern no prohibition to such a procedure within N.J.S.A. 53:1-20.22, which disallows additional sampling only if the previously received sample "was adequate for successful analysis and identification." Here, the State is contending that the existing sample(s) of J.P. in the CODIS databank, given the chain-of-custody problems, may not be "adequate" for admissibility at the time of trial. We need not resolve that adequacy question on the limited record before us. That issue can be examined more fully by the trial court if the State files a new motion, post-charge.

For all of these reasons, we affirm the trial court's order denying the State's application, without prejudice to the State filing a new application with the trial court when and if it charges and "arrests" J.P.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0228-18T1