SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**In the Matter of the Investigation of Burglary and Theft (A-61-18) (082243)**

**Argued October 23, 2019 -- Decided January 21, 2020**

**SOLOMON, J., writing for the Court.**

The Court considers whether, under Rule 3:5A-1 and Rule 3:5A-4(d), the State should be permitted to obtain a follow-up buccal swab from J.P. so as to be able to prove in court a preliminary match between his DNA and a DNA specimen taken from the scene of an unsolved burglary.

The Combined DNA Index System (CODIS) database operates on both the national and state levels. The National DNA Index System (NDIS) is administered by the FBI. In New Jersey, the state system is managed by the State Police Office of Forensic Sciences (Forensics Office). Operational and/or procedural issues not addressed by federal statute are determined by the FBI as administrator of the NDIS. Significantly, state and local law enforcement agencies may be excluded from using CODIS if they fail to uphold its quality assurance procedures and standards.

For DNA samples routinely taken upon arrest, the Forensics Office permits submission by mail rather than by hand-delivery. If an offender sample is matched to a sample in CODIS, the Forensics Office informs law enforcement of the need for a legally obtained sample from the offender that documents the chain of custody through hand-delivery. Only then -- with the results of this follow-up analysis supported by a chain of custody -- will the State's proof of the CODIS match withstand scrutiny in court.

In this case, police took a DNA sample from blue gloves discarded near the scene of a March 2015 burglary, and the sample was uploaded into CODIS. J.P. was later convicted of an unrelated felony, and a routine sample of his DNA was mailed to the Forensics Office. The Forensics Office confirmed a preliminary match between the DNA sample found on the blue gloves and J.P.'s routine offender sample. The notification requested that the local officials submit a follow-up sample to prove the match.

As a result of that request, the State applied for J.P.'s investigative detention under Rule 3:5A-1 to obtain a new DNA sample. The court denied the motion, and the Appellate Division affirmed, holding that the State had not shown that the physical characteristics sought cannot otherwise practicably be obtained. The Appellate Division

1

suggested in dicta that the State could obtain a new sample by arresting J.P. for the 2015 burglary. The Court granted the State's motion for leave to appeal. 237 N.J. 170 (2019).

**HELD:** In light of the federal and state requirements to obtain a follow-up sample, the State has shown that the physical characteristics sought in this case cannot practicably be obtained by any means other than investigative detention pursuant to Rule 3:5A-1. The Court therefore reverses the judgment of the Appellate Division.

1. Rule 3:5A permits temporary investigative detentions under certain circumstances and establishes procedural requirements for such detentions. Specifically, Rule 3:5A-1 provides that a judge of the Superior Court may authorize the temporary detention of a person "for the purpose of obtaining evidence of that person's physical characteristics" under certain circumstances. And, as relevant here, Rule 3:5A-4 provides that such an order "shall be issued only if" the State's application persuades the court of four things. The parties agree that the first three prongs of Rule 3:5A-4 are satisfied in this case and disagree only regarding Rule 3:5A-4(d). (pp. 10-11)

2. Rule 3:5A-4(d) asks whether "the physical characteristics sought cannot otherwise practicably be obtained." The rule essentially requires a court to make two determinations: (1) whether "the physical characteristics sought" can be obtained through other means; and (2) whether that can be done "practicably." The facts of this case illustrate the significance of the second inquiry. The Forensics Office cannot comply with federal requirements or advance its investigation, see R. 3:5A-4(c), by retesting stored samples that have been mailed. The NDIS expressly requires a follow-up sample supported by chain of custody -- without regard to any record of chain of custody for the initial sample. Furthermore, practical limitations make it appropriate for law enforcement agencies to submit by mail rather than by hand-delivery the approximately 15,000 routine offender samples received by the Forensics Office each year. J.P.'s counsel has conceded that, if J.P. is charged, counsel will challenge the preliminary match as unreliable based on chain of custody. The specter of such evidentiary challenges is another reason why it would not be appropriate to foreclose the State from obtaining new DNA samples under circumstances like these. (pp. 12-14)

3. The Appellate Division suggested that probable cause exists to arrest J.P. for the 2015 burglary and that the State could obtain a new buccal swab upon J.P.'s arrest. Since arrest is a greater intrusion than a buccal swab, it is not an alternative to Rule 3:5A-1. Rule 3:5A-4's fourth prong is designed to protect against unwarranted intrusions, not encourage a greater intrusion than is necessary. (p. 14)

**REVERSED and REMANDED for further proceedings.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and TIMPONE join in JUSTICE SOLOMON'S opinion.**

2

# SUPREME COURT OF NEW JERSEY
## A-61 September Term 2018
### 082243

In the Matter of the Investigation
of Burglary and Theft.

On appeal from the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| October 23, 2019 | January 21, 2020 |

Shiraz Deen, Assistant Prosecutor, argued the cause for appellant State of New Jersey (Bradley D. Billhimer, Ocean County Prosecutor, attorney; Samuel Marzarella, Chief Appellate attorney, of counsel, and Shiraz Deen and on the briefs).

Brian P. Keenan, Assistant Deputy Public Defender, argued the cause for respondent J.P. (Joseph E. Krakora, Public Defender, attorney; Brian P. Keenan, of counsel and on the briefs).

Lila B. Leonard, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Lila B. Leonard, of counsel and on the briefs).

JUSTICE SOLOMON delivered the opinion of the Court.

Rule 3:5A-1 allows a Superior Court judge to order temporary detention to obtain evidence of a person's physical characteristics under certain circumstances.  Rule 3:5A-4(d) mandates that such an order issue only if "the

physical characteristics sought cannot otherwise practicably be obtained." In this case, a DNA specimen was taken from the scene of an unsolved burglary and the DNA profile was uploaded to the Combined DNA Index System (CODIS) database. When J.P. was arrested for an unrelated offense, a DNA sample was taken from him and uploaded to CODIS. An analysis of the two DNA samples revealed a match. We must determine whether, under Rule 3:5A-1 and Rule 3:5A-4(d), the State should be permitted to obtain a follow-up buccal swab from J.P. so as to be able to prove the preliminary match in court.

The trial court denied the State's Rule 3:5A-1 motion to obtain a new sample of respondent J.P.'s DNA on the ground that the evidence could be otherwise obtained. The Appellate Division affirmed that determination. In light of the federal and state requirements to obtain a follow-up sample, we hold that the State has shown that the physical characteristics sought cannot practicably be obtained by any means other than investigative detention pursuant to Rule 3:5A-1. We therefore reverse the judgment of the Appellate Division.

## I.

To provide context for the events of this case and the parties' arguments, we begin by reviewing the relevant federal and state procedures and requirements concerning DNA collection and recordation.

Established by the Director of the Federal Bureau of Investigation (FBI) under the DNA Identification Act of 1994, CODIS uses a software program and database to match DNA profiles of offenders to profiles of DNA found on crime scene evidence.  34 U.S.C. § 12592(a), (b)(3); National DNA Index System (NDIS) Operational Procedures Manual (NDIS Manual), 54-56 (Version 8: Effective May 1, 2019), https://www.fbi.gov/file-repository/ndis-operational-procedures-manual.pdf.  CODIS operates on both the national and state levels: The National DNA Index System (NDIS) is administered by the FBI, and the State DNA Index System (SDIS) is administered by states participating in the CODIS program.  NDIS Manual at 4; see also A.A. ex rel. B.A. v. Attorney Gen. of N.J., 189 N.J. 128, 132-33 (2007) (discussing collection of DNA samples and submission to CODIS).  In New Jersey, the SDIS is managed by the CODIS unit under the New Jersey State Police Office of Forensic Sciences (Forensics Office).  N.J. State Police, DNA Laboratory, https://www.njsp.org/division/investigations/dna-lab.shtml (last visited Dec. 9, 2019).

"Operational and/or procedural issues not addressed by the [DNA Identification Act] . . . are determined by the FBI as administrator of the [NDIS]."  NDIS Manual at 4.  "The responsibilities of the FBI and the NDIS participants are explained in the NDIS Operational Procedures."  Id. at 6.  Significantly, state and local law enforcement agencies may be excluded from using CODIS if they fail to

3

uphold its quality assurance procedures and standards. 34 U.S.C. § 12592(b) to (c).

New Jersey law imposes additional requirements on the collection and preservation of DNA samples. Under the DNA Database and Databank Act of 1994 (DNA Act), N.J.S.A. 53:1-20.17 to -20.38, certain offenders must provide DNA samples to be stored by the Forensics Office in a state DNA databank. N.J.S.A. 53:1-20.20(a) to (h). The DNA Act further provides that "[n]othing in this act shall . . . limit or preclude collection of DNA samples as authorized by <u>court order</u> or in accordance with any other law." N.J.S.A. 53:1-20.20(i) (emphasis added).

For routine offender samples -- those routinely taken upon arrest, for example, which generally are not expected to be offered as evidence at trial -- there is usually no need to assure evidentiary admissibility by establishing a chain of custody. As a result, the Forensics Office permits local law enforcement to submit routine offender samples by mail rather than by hand-delivery. Memorandum from Joseph R. Petersack, Chief Forensic Scientist, N.J. State Police Office of Forensic Scis., and Janet Flagman, Deputy Attorney Gen., Office of the Attorney Gen. CODIS Compliance Unit, on Collecting DNA Samples -- Offender Samples Versus Reference/Person of Interest Samples 1-2 (June 6, 2013) (explaining that unlike follow-up offender samples, which "require strict chain of custody for

4

future court purposes and should be hand-delivered to" the Forensics Office by the law enforcement agency collecting the sample, routine offender samples "are submitted through the [U.S.] mail and have no chain of custody"); see also State v. Gathers, 234 N.J. 208, 218 (2018) ("[D]ue to chain-of-custody problems, many DNA collection kit profiles are not considered evidence. According to the State, even after a CODIS hit, the State usually applies for a confirmatory buccal swab to establish the chain of custody.").

When the Forensics Office receives a DNA sample, it analyzes the sample to create a DNA profile and then forwards that profile to the FBI to be uploaded to CODIS. N.J.S.A. 53:1-20.21. The DNA profile may be used for, among other things, "law enforcement identification purposes; . . . administrative and quality control purposes; . . . [and] judicial proceedings, by order of the court, if otherwise admissible." N.J.S.A. 53:1-20.21(a), (e), (f).

If CODIS identifies significant similarity between the DNA profiles of an offender sample and of a sample found on crime scene evidence, and if an NDIS DNA casework analyst reviews those samples and confirms there is a match, the NDIS sends an "investigative hit notification" to appropriate state authorities, like the Forensics Office. NDIS Manual at 58-59. Although this "concludes the NDIS Offender Match confirmation process, it is not the end of the collaboration." Id. at 59. The NDIS then discloses to the Forensics Office

5

personally identifiable information about the offender whose DNA profile matched the DNA profile on crime scene evidence, id. at 59, 63-64, and the Forensics Office informs the relevant law enforcement agency "of the need for a legally obtained sample from the offender that documents the chain of custody[,]" so that the Forensics Office "can then perform DNA analysis on the newly obtained known biological sample," id. at 59. Only then -- with the results of this follow-up analysis supported by a chain of custody -- will the State's proof of the CODIS match withstand scrutiny in court.

## II.

## A.

Against that backdrop, we turn to the facts of the case as revealed by the trial court record of the State's Rule 3:5A-1 motion to obtain a new sample of J.P.'s DNA.

In March 2015, Lakewood police responded to an alarm at a church. A witness informed officers that she heard glass shatter and then saw a man run through her yard and toss blue gloves into a trash can in front of her home. Officers found the blue gloves, and the Ocean County Sheriff's Department submitted a DNA sample from the gloves to the Forensics Office, which, in turn, took steps to have that sample's DNA profile uploaded to CODIS.

6

At some point between March 2015 and December 2018, J.P. was convicted of an unrelated felony. Local law enforcement took a routine sample of J.P.'s DNA pursuant to the DNA Act and mailed that sample to the Forensics Office. After analyzing the sample to create a profile, the Forensics Office stored the sample in the state DNA databank and forwarded the profile to the FBI to be uploaded to CODIS.

In February 2018, the Forensics Office sent an "investigative hit notification" to the Lakewood Police Department, confirming a preliminary match between the DNA sample found on the blue gloves and J.P.'s routine offender sample. The notification cautioned, however, that only a "possible investigative lead" had been confirmed and requested that local officials again "submit a buccal swab reference sample to the laboratory for comparison to the evidentiary DNA profiles."

J.P. was arrested again in April 2018 for a parole violation, after which he was compelled to submit to another routine DNA sample. Once more, that sample was mailed to the Forensics Office, the DNA profile was uploaded to CODIS, and the sample was stored in the state DNA databank.

J.P. is currently incarcerated but has not been charged or arrested in connection with the March 2015 church burglary.

7

B.

As a result of the Forensics Office's "investigative hit notification" and request for a follow-up sample to prove the preliminary match, the State applied for J.P.'s investigative detention under Rule 3:5A-1 to obtain a new DNA sample. The State argued that the "physical characteristics sought cannot otherwise practicably be obtained," R. 3:5A-4(d), even though the State had access to J.P.'s past samples.

The court denied the State's motion, and the Appellate Division affirmed, holding that the State had not shown that the physical characteristics sought cannot otherwise practicably be obtained. The Appellate Division suggested in dicta that the State could obtain a new sample by arresting J.P. for the March 2015 church burglary.

We granted the State's motion for leave to appeal. 237 N.J. 170 (2019).

III.

The State argues that because J.P.'s offender samples were mailed rather than hand-delivered to the Forensics Office, they have a flawed chain of custody and cannot be used to advance the investigation. The State asserts that it must obtain a new DNA sample from J.P. not only to comply with CODIS requirements but also to eliminate the risk that the preliminary match may be inadmissible at trial. Because that can be accomplished only by hand-

delivering a new sample to the Forensics Office, the State contends that Rule

3:5A-4(d)'s requirements have been met here. The State emphasizes that the

difficulty presented in this case cannot be remedied by requiring hand-delivery

of all routine offender DNA samples because it would be unfeasible for local

law enforcement to hand-deliver the approximately 15,000 samples taken each

year. The State adds that the redundancy in the CODIS procedures created by

the need for a follow-up sample not only assures the admissibility of State

evidence but also serves to protect suspects like J.P. against wrongful arrest.

J.P. claims that the chain-of-custody problem arises not from the

requirements of CODIS but from the State's choice to mail rather than hand-

deliver his initial offender samples to the Forensics Office. He acknowledges

that, absent proof of chain of custody, he would challenge the preliminary

CODIS match at trial if charged with the church burglary. J.P. nevertheless

argues that the Court should affirm "because the State failed to satisfy the

requirements of Rule 3:5A-4." J.P. also relies on Gathers and other guidance

pertinent to post-arrest investigations.

IV.

A.

We begin by noting that J.P.'s reliance on Gathers is misplaced. The

guidelines and procedures applicable when the State seeks to use non-

testimonial identification procedures to further post-arrest investigations are not relevant in this pre-arrest context. This case is instead subject to the requirements of Rule 3:5A, which enables the State to use such procedures to further pre-arrest investigations.

Rule 3:5A was adopted in response to State v. Hall, where the State sought to compel a suspect to participate in a pre-arrest lineup. See 93 N.J. 552, 555-57 (1983). We held in that case "that there is jurisdictional authority that empowers the Superior Court to issue process to compel a suspect to submit to an investigative detention" and called upon the Criminal Practice Committee "to study the issue of investigative detentions and recommend rules to be implemented in this jurisdiction." Id. at 568. Rule 3:5A, adopted in July 1984, permits temporary investigative detentions under certain circumstances and establishes procedural requirements for such detentions.

Specifically, Rule 3:5A-1 provides that, before the "filing of a formal criminal charge against a person, an order authorizing the temporary detention of that person and compelling that person to submit to non-testimonial identification procedures for the purpose of obtaining evidence of that person's physical characteristics may be issued by a judge of the Superior Court." And, as relevant here, Rule 3:5A-4 provides that such an order "shall be issued only

10

if" the application from the Office of the Attorney General or County

Prosecutor persuades the court that:

> (a) a crime has been committed and is under active investigation, and
>
> (b) there is a reasonable and well-grounded basis from which to believe that the person sought may have committed the crime, and
>
> (c) the results of the physical characteristics obtained during the detention will significantly advance the investigation and determine whether or not the individual probably committed the crime, and
>
> (d) the physical characteristics sought cannot otherwise practicably be obtained.

The parties agree that the first three prongs of Rule 3:5A-4 are satisfied in this case and disagree only regarding Rule 3:5A-4(d).[1] Thus, the issue hinges on whether the sample sought here can be practicably obtained, within the meaning of the Rule 3:5A-4(d), in another manner.

We review the meaning of a court rule de novo, guided by the standard principles of statutory construction. State v. Robinson, 229 N.J. 44, 66-67 (2017). We begin with the rule's plain language, giving the words their

---

[1] The parties agree that on this record the State met its burden under subsection (b), and the Court further determines that probable cause was established.

11

ordinary meaning. <u>Wiese v. Dedhia</u>, 188 N.J. 587, 592 (2006). Here, we interpret subsection (d) as a matter of first impression.

V.

Again, <u>Rule</u> 3:5A-4(d) asks whether "the physical characteristics sought cannot otherwise practicably be obtained." The rule essentially requires a court to make two determinations: (1) whether "the physical characteristics sought" can be obtained through other means; and (2) whether that can be done "practicably." If something is "practicable," it is "<u>reasonably</u> capable of being accomplished; <u>feasible</u>." <u>Black's Law Dictionary</u> 1291 (9th ed. 2009) (emphases added). The first inquiry under subsection (d) requires an assessment of possibility; the second demands a more nuanced, holistic evaluation. The facts of this case illustrate the significance of the second inquiry.

First, J.P.'s routine offender sample was submitted to the Forensics Office by mail. That sample matched the DNA sample from the church burglary, and, as explained above, the NDIS considers the preliminary CODIS match confirmed. Nevertheless, to conclusively establish that the samples are from the same source, the NDIS requires that the Forensics Office obtain a follow-up DNA sample with a documented chain of custody to be compared to the DNA sample on the evidence -- the blue gloves. Accordingly, the

12

Forensics Office cannot comply with federal requirements or advance its investigation, see R. 3:5A-4(c), by recalling and retesting stored samples that have been mailed. Therefore, without resort to investigative detention to obtain a follow-up DNA sample with a confirmed chain of custody and evidentiary value, "the physical characteristics sought cannot . . . practicably be obtained." R. 3:5A-4(d).

Contrary to J.P.'s contention that this need was created by the State's failure to maintain chain of custody for the earlier samples, the NDIS expressly requires that the Forensics Office obtain a follow-up sample supported by chain of custody -- without regard to any record of chain of custody for the initial sample. NDIS Manual at 59 (stating that the Forensics Office "shall inform" the relevant enforcement agency "of the need for a legally obtained sample from the offender that documents the chain of custody[,]" so that the Forensics Office "can then perform DNA analysis on the newly obtained known biological sample" (emphases added)). Furthermore, practical limitations make it appropriate for law enforcement agencies to submit by mail rather than by hand-delivery the approximately 15,000 routine offender samples received by the Forensics Office each year.

Although J.P. argues that there is no need to satisfy the NDIS with an additional sample because the State can use the earlier samples to establish the

13

preliminary CODIS match at trial, J.P.'s counsel has conceded that, if J.P. is charged, counsel will challenge the preliminary match as unreliable based on chain of custody. Counsel admits he will make that challenge even though he now opposes the State's effort to obtain a sample that would either yield a reliable match or ensure J.P. is not arrested in error. The specter of such evidentiary challenges is another reason why it would not be appropriate to foreclose the State from obtaining new DNA samples under circumstances like these.

Finally, the Appellate Division, relying on the preliminary DNA match, suggested that probable cause exists to arrest J.P. and the State could obtain a new buccal swab upon J.P.'s arrest. Since arrest is a greater intrusion than a buccal swab, it is not an alternative to Rule 3:5A-1. Indeed, resort to alternatives more intrusive than investigative detention turns on its head Rule 3:5A-4's fourth prong, which is designed to protect against unwarranted intrusions, not encourage a greater intrusion than is necessary.

In short, a sample with an established chain of custody is required to proceed with this investigation. In light of the circumstances of this case and the legal requirements for DNA sample collection, such a sample "cannot otherwise practicably be obtained" without investigative detention. It would be overly burdensome on the State to require that all routine DNA samples be

14

hand-delivered to the Forensics Office -- a reality anticipated in the NDIS requirements themselves. And it would likewise be unduly burdensome to demand the State arrest a defendant to obtain a sample that may, in fact, exonerate him. Accordingly, we determine that the State has satisfied all four requirements of Rule 3:5A-4.

VI.

For the reasons set forth above, the judgment of the Appellate Division is reversed and the case is remanded for proceedings consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and TIMPONE join in JUSTICE SOLOMON'S opinion.